**THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| SHIBUMI SHADE, INC.<br><br>Plaintiff,<br><br>v.<br><br>BEACH SHADE LLC, and<br>MATTHEW FINNERAN<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No: 5:21-cv-256<br><br>**MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER PURSUANT TO FED. R. CIV. P. 65** |

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Shibumi Shade, Inc. ("Shibumi Shade" or "Plaintiff"), submits this Memorandum of Law in Support of Its Emergency Motion for Temporary Restraining Order.

## CASE SUMMARY

Plaintiff Shibumi Shade poured its blood, sweat, and tears, into creating the best and most innovative sun shade product to hit the market in years. It is lightweight, compact, durable, and effective. Customers love the Shibumi Shade product and the company has been growing leaps and bounds for several years. Plaintiff's innovative shade concept is protected by multiple patent, trade dress and other intellectual property rights, and Plaintiff has spent significant time and resources to obtain, defend, and enforce those rights.

Without spending the same time, money, and sweat equity as Shibumi Shade, Defendants recently launched a copycat product that attempts to siphon off a portion of Plaintiff's customer base, while also irreparably damaging Plaintiff's carefully protected reputation and brand recognition due to the inferior nature of Defendants' products.

Plaintiff initiated this action today, on June 11, 2021, against Defendants Beach Shade LLC ("Beach Shade LLC") and Matthew Finneran ("Finneran") (collectively "Defendants") alleging patent infringement, trade dress infringement, and unfair and deceptive trade practices pursuant to North Carolina General Statute 75-1 *et seq.* Defendants have engaged in the unauthorized sale and marketing of products ("Accused Product" or "Beach Shade") which infringe on Plaintiff's valid utility patents and trade dress. Defendants' continued sale and marketing of the Accused Product and its use of Plaintiff's highly distinctive and widely recognized trade dress has harmed and continues to irreparably harm Plaintiff. Plaintiff seeks a temporary restraining order enjoining Defendants from unlawfully selling or marketing the Accused Product which infringes Plaintiff's intellectual property.

## STATEMENT OF FACTS

Plaintiff launched its product, called the Shibumi Shade ("Shibumi Shade") in 2016 after working on the design for over a year. Declaration of Dane Barnes ("Barnes Decl.") ¶¶ 2-3.[1] Since launching the Shibumi Shade, Plaintiff has garnered tremendous praise and recognition for its high quality products, which are sewn in North Carolina and Virginia, customer service, and warranty and has been featured in top selling newspapers and magazines like the New York Times and Garden & Gun Magazine and on TV shows. *Id.* ¶ 4. All of these factors have contributed to the Shibumi Shade's commercial success and, because of that success, the Shibumi Shade has sold out every year for the five years since it launched. *Id.* ¶ 9. The Shibumi Shade disrupted the beach shade industry when it was first introduced and continues to be one of

[1] References to the Barnes Declaration herein refer to the Declaration of Dane Barnes, submitted contemporaneously herewith.

the most popular shades on the market. *Id.* Plaintiff's customers have come to expect that its products are of the highest quality and are willing to pay a premium for its products for these very reasons. *Id.* ¶ 4.

The Shibumi Shade is the subject of two valid issued utility patents, the U.S. Patent No. 10,753,117 (the "'117 Patent") and U.S. Patent No. 10,190,330 (the "'330 Patent") (collectively the "Patents-in-Suit"), six pending utility and design patent applications, and one patent publication. Unlike other beach shades on the market, the Shibumi Shade has a distinctive design with a rectangular canopy aerially suspended and attached only on one side to a frame. *Id.* ¶ 6. The Shibumi Shade has a cord that extends from the center of the frame of the canopy to the canopy's carrying case, which can function as an anchor to hold the canopy in the ground when filled with sand. *Id.* The Shibumi Shade canopy has a unique, two-tone color scheme of royal blue and teal that is designed to blend in with the sky and the beach landscape. *Id.* The Shibumi Shade's canopy distinctly waves in the wind, which creates a unique visual impression on customers. *Id.* Plaintiff invested significant time, money, and resources into designing its product and building its business, and takes great measures to protect both its reputation and its intellectual property. *Id.* ¶¶ 2, 4-5.

Because of that success, the Shibumi Shade has been the subject of numerous copycats attempting to trade off of the Shibumi Shade's popularity and commercial success since it launched in 2016. *Id.* ¶ 10. Plaintiff first became aware of Defendants in early April 2021 but did not learn that Defendants were offering the Accused Product for sale until May 24, 2021 when the Accused Product was first listed on Beach Shade LLC's website. *Id.* ¶ 11. Upon learning that Defendants were offering the Accused Product for sale, Plaintiff sent a letter demanding that Defendants cease and desist from selling or marketing the Accused Product or

any other product that infringed Plaintiff's patents and other intellectual property. *Id.* ¶ 14; Ex. A. In a response from Defendants' counsel on June 2, 2021, Defendants stated that they would not cease their infringement. Ex. B. That same day, June 2, 2021, Defendants listed the Accused Product for sale on Amazon. Barnes Decl. ¶ 17.

Subsequently, on June 7, 2021—one day after Plaintiff learned that Defendants had listed the Accused Product for sale on Amazon (Barnes Decl. ¶ 17)—Plaintiff notified Defendants that it would seek emergency relief from Defendants' infringement unless Defendants confirmed that they would immediately stop selling the Accused Product and destroy any existing inventory. Ex. C. In a response on June 9, 2021, counsel for Defendants confirmed that Defendants would not immediately cease sales of the Accused Product or destroy existing inventory. Ex. D. On June 11, 2021, the same day that the Complaint and the instant motion were filed, Plaintiff notified counsel for Defendants that Plaintiff had no choice but to file the present suit and seek immediate relief from the Court in light of Defendants' ongoing and willful infringement of Plaintiff's intellectual property and the ongoing and imminent irreparable harm that would result. Ex. E.

In addition to letters and other correspondence exchanged between Plaintiff's and Defendants' counsel, Plaintiff had several conversations—both in person and via telephone—with Defendant Matthew Finneran in an ongoing effort to have Defendants immediately cease their infringement, none of which were successful. Barnes Decl. ¶¶ 13, 15-16, 18. In fact, rather than cease or reduce their infringement, Defendants escalated their infringement at every turn—listing the Accused Product for sale on platforms like Amazon and even raising the price of the Accused Product. *Id.* ¶¶ 17-19.

Defendants' continued sale and marketing of the Accused Product despite repeated requests demonstrates Defendants' willful infringement, which will irreparably harm Plaintiff unless immediately enjoined.

## ARGUMENT

This Court has authority to issue a temporary restraining order pursuant to Fed. R. Civ. P. 65(b). Courts ruling on requests for temporary restraining orders consider (1) likelihood of success on the merits, (2) likelihood of irreparable harm to movant in the absence of preliminary relief, (3) the balance of equities, and (4) the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (preliminary injunction); *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (preliminary injunction); *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 188 (4th Cir. 2013) (preliminary injunction); *Campbell All. Grp., Inc. v. Dandekar*, No. 5:13-CV-00415-FL, 2014 WL 51241, at *3 (E.D.N.C. Jan. 7, 2014) (temporary restraining order); *Patel v. Moron*, 897 F. Supp. 2d 389, 395 (E.D.N.C. 2012) (same standards apply to a court's decision whether to grant a temporary restraining order). In the Fourth Circuit, the "irreparable harm to the plaintiff and the harm to the defendant are the two most important factors." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). Thus, where a movant shows irreparable injury and likelihood of success on the merits, and where the equities favor the granting of relief, a court should grant the requested order. *See Centro Tepeyac*, 722 F.3d at 191. Here, all four factors weigh in favor of the court granting a temporary restraining order against Defendants.

### A. Plaintiff Has a Substantial Likelihood of Success on the Merits.

Plaintiff has asserted claims against Defendants for patent infringement and trade dress infringement. While Plaintiff is likely to succeed on the merits of all of these claims, it need not

succeed on all claims in order to receive an injunction to prevent irreparable harm. Where "multiple causes of action are alleged," the plaintiff "need only show likelihood of success on one claim to justify injunctive relief." *McNeil-PCC, Inc. v. Granutec, Inc.*, 919 F. Supp. 198, 201 (E.D.N.C. 1995). Moreover, to obtain injunctive relief, Plaintiff must only show it is likely to succeed at trial to obtain injunctive relief. *Pashby*, 709 F.3d at 321 (citations omitted). Plaintiff need not show certainty of success at trial. *Id.* at 321.

Plaintiff is likely to succeed on its patent and trade dress infringement claims. To satisfy this criterion for its patent infringement claims, Plaintiff must show that it will likely prove infringement of one or more claims of the '330 and '117 Patents and that at least one of those claims is likely to withstand any validity challenge. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350-51 (Fed. Cir. 2001), *abrogated on other grounds by eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). To satisfy this criterion for its trade dress infringement claim, Plaintiff must show that it will likely prove: "(1) the trade dress is primarily non-functional; (2) the trade dress is inherently distinctive or has acquired a secondary meaning to customers; and (3) the alleged infringement creates a likelihood of confusion among customers as to a product's source." *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 657 (4th Cir. 2020) (citations omitted).

### 1. Plaintiff Is Likely to Succeed on its Patent Infringement Claims

As described in more detail in Plaintiff's claim charts attached hereto as Exhibits F and G, the Accused Product infringes at least independent Claim 1 of each of the '330 Patent and '117 Patent.

For example, Claim 1 of the '330 Patent recites:

1. A system for providing shade onto a surface, comprising:

> a canopy configured for engagement with, and complete aerial suspension by, a single, continuous frame,
>
> wherein the frame consists essentially of a plurality of sections configured for end-to-end alignment from a left end to a right end, wherein each section is configured to engage with any adjacent sections,
>
> wherein the left end and the right end are configured to be secured to the surface for aerially supporting the frame and completely suspending the canopy aerially, and
>
> a container for housing and transporting all of the other components of the system, wherein the container is also an anchor for housing weight,
>
> a cord selectively engaged or coupled to an interior of the container for inverting the container to serve as the anchor for housing weight, the cord selectively engageable or coupled to the frame.

As shown below, the Accused Product either literally or equivalently contains each and every claimed element of at least Claim 1 of the ’330 Patent.




For example, the Accused Product either literally or equivalently contains a system for providing shade onto a surface (Ex. F at 1), comprising a canopy configured for engagement with, and complete aerial suspension by, a single, continuous frame (Ex. F at 2) wherein the

frame consists essentially of a plurality of sections configured for end-to-end alignment from a left end to a right end (Ex. F at 3-4), and wherein each section is configured to engage with any adjacent sections and wherein the left end and the right end are configured to be secured to the surface for aerially supporting the frame and completely suspending the canopy aerially (Ex. F at 4-5). The system of the Accused Product further comprises a container for housing and transporting all of the other components of the system, wherein the container is also an anchor for housing weight (Ex. F at 6-7), and a cord selectively engaged or coupled to an interior of the container for inverting the container to serve as the anchor for housing weight, the cord selectively engageable or coupled to the frame (Ex. F at 8-9).

Further, Claim 1 of the ’117 Patent recites:

> 1. A system for providing shade onto a surface, the system comprising:
>
> a frame being directly engageable with the surface such that when the frame is directly engaged with the surface, the frame is configured to lie within a plane substantially perpendicular to the surface, wherein the frame comprises a plurality of longitudinally-extending sections arrangeable so that a first longitudinally-extending section and a second longitudinally-extending section are each directly engaged with the surface at first ends thereof and are coupleable to one another about opposing, second ends or are each respectively coupleable to first and second ends of at least one intermediate longitudinally-extending section arranged therebetween;
>
> a cable extending through the plurality of longitudinally-extending sections of the frame from the first end of the first longitudinally-extending section to the first end of the second longitudinally-extending section and any of the at least one intermediate longitudinally-extending sections arranged therebetween so that when the first end of the first longitudinally-extending section and the first end of the second-longitudinally extending section are directly engaged with the surface, the cable is configured to lie within the plane substantially perpendicular to the surface;
>
> a canopy extending between a suspension end and an opposing trailing end, the suspension end of the canopy being coupleable with the frame about a portion of the frame defined between the first ends of the first and second longitudinally-extending sections, wherein the trailing end of the canopy is spaced apart from the portion of the frame such that when a wind force is applied to the canopy, the canopy extends at an angle relative to the plane, the angle being non-coplanar with the plane and varying with the wind force;

a cord having a first end and a second end, the first end or the second end of the cord being coupleable to the frame; and

an anchor coupleable to the other of the second end or the first end of the cord and being in contact with the surface at an angle relative to the plane so that the frame remains substantially within the plane when the wind force is applied to the canopy.

As shown below, the Accused Product either literally or equivalently contains each and every claimed element of at least Claim 1 of the '117 Patent.




For example, the Accused Product either literally or equivalently contains a system for providing shade onto a surface (Ex. G at 1), comprising a frame being directly engageable with the surface such that when the frame is directly engaged with the surface, the frame is configured to lie within a plane substantially perpendicular to the surface, wherein the frame comprises a plurality of longitudinally-extending sections arrangeable so that a first longitudinally-extending section and a second longitudinally-extending section are each directly engaged with the surface at first ends thereof and are coupleable to one another about opposing, second ends or are each

respectively coupleable to first and second ends of at least one intermediate longitudinally-extending section arranged therebetween (Ex. G at 2-6). The Accused Product further comprises a cable extending through the plurality of longitudinally-extending sections of the frame from the first end of the first longitudinally-extending section to the first end of the second longitudinally-extending section and any of the at least one intermediate longitudinally-extending sections arranged therebetween so that when the first end of the first longitudinally-extending section and the first end of the second-longitudinally extending section are directly engaged with the surface, the cable is configured to lie within the plane substantially perpendicular to the surface (Ex. G at 7-8). Additionally, the Accused Product comprises a canopy extending between a suspension end and an opposing trailing end, the suspension end of the canopy being coupleable with the frame about a portion of the frame defined between the first ends of the first and second longitudinally-extending sections, wherein the trailing end of the canopy is spaced apart from the portion of the frame such that when a wind force is applied to the canopy, the canopy extends at an angle relative to the plane, the angle being non-coplanar with the plane and varying with the wind force. Ex. G at 9-12. Finally, the Accused Product comprises a cord having a first end and a second end, the first end or the second end of the cord being coupleable to the frame (Ex. G at 13), and an anchor coupleable to the other of the second end or the first end of the cord and being in contact with the surface at an angle relative to the plane so that the frame remains substantially within the plane when the wind force is applied to the canopy (Ex. G at 14-15).

Plaintiff is also likely to withstand any validity challenges that Defendants raise. The Asserted Patents were both substantively examined with several office actions and prior art rejections. During the prosecution of the ’117 Patent, the examiner issued a Non-Final Office Action and a Final Office Action (both including substantive, prior art rejections under 35 U.S.C.

§§ 102 or 103) and cited seventeen prior art patent documents. During the prosecution of the ’330 Patent, the examiner similarly issued Non-Final and Final Office Actions with prior art rejections and cited eighteen prior art patent documents.

### 2. Plaintiff Is Likely to Succeed on its Trade Dress Infringement Claim

#### a. Plaintiff’s Trade Dress Is Primarily Non-Functional

The Supreme Court has explained that a trade dress is primarily functional “if it is essential to the use or purpose of the article or if it affects the cost or quality of the article[.]” *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995) (quoting *Inwood Lab’ys, Inc. v. Ives Lab’ys, Inc.*, 456 U.S. 844, 850 n. 10 (1982)). Here, Plaintiff’s novel and highly distinctive design (shown below) includes a rectangular canopy with a distinctive dual royal blue and teal color attached only on one side to a frame, with a cord extending from the center of the frame to an anchor consisting of the canopy’s carrying case filled with sand.





The distinctive trade dress features of the Shibumi Shade as described and shown above are non-functional and together comprise a design that identifies the Shibumi Shade as originating from a single source—Plaintiff. The particular design, appearance, and arrangement of these elements as a whole separate it from the utilitarian requirements to create a beach shade. *See Leviton Mfg. Co. v. Universal Sec. Instruments, Inc.*, 304 F. Supp. 2d 726, 735 (D. Md. 2004) ("Trade dress may include features such as size, ***shape***, ***color or color combinations***, texture, graphics or particular sales techniques." (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n. 1 (1992) (emphasis added)). Plaintiff developed and marketed a distinctive trade dress for which it expends significant resources to be associated directly and solely with Plaintiff. That the Shibumi Shade is covered by pending design patent applications is further evidence that Plaintiff's trade dress is non-functional in nature.

**b. <u>Plaintiff's Trade Dress Has Acquired Secondary Meaning</u>**

The Fourth Circuit has held that "evidence of intentional, direct copying establishes a prima facie case of secondary meaning sufficient to shift the burden of persuasion to the defendant on that issue[.]" *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 448 (4th Cir. 1986). Here, there is no question that Defendants intentionally copied Plaintiff's trade dress. On May 24, 2021, shortly after learning that Defendants were offering the Accused Product for sale, Shibumi Shade co-founder Dane Barnes spoke with Defendant Finneran. Barnes Decl. ¶ 13. During the call, Mr. Finneran said that he liked Plaintiff's product and wanted to work with Plaintiff. *Id.* Mr. Finneran acknowledged that his product, the Accused Product, is made of inferior materials to the Shibumi Shade. *Id.* When asked why Defendants did not approach Plaintiff directly with their proposal prior to launching the Accused Product, Mr. Finneran replied that he was advised not to approach Plaintiff by his attorneys over concerns that

Defendants would be accused of copying. *Id.* On June 3, 2021, Mr. Finneran and Shibumi Shade co-founders Dane and Scott Barnes met in person to discuss Plaintiff's allegations of infringement. *Id.* ¶ 15. During that meeting, Mr. Finneran said that he admired Plaintiff and viewed Plaintiff as one of the premier companies in the beach shade industry and launched his Beach Shade product specifically to get Plaintiff's attention and get a "seat at the table" to discuss a potential partnership. *Id.* Mr. Finneran admitted to manufacturing and importing the Accused Product from China and establishing a supply chain for distribution in the United States. Mr. Finneran also acknowledged that the Accused Product would compete with and take sales away from Plaintiff. *Id.*

Additionally, Plaintiff has acquired distinctiveness in its trade dress through its long-time use and commercial success that has established secondary meaning for Plaintiff's design in the minds of the public. The Fourth Circuit has outlined four factors to consider as to whether a mark has acquired secondary meaning: "(1) long use; (2) advertising; (3) sales volume; and (4) identity of service or origin in the minds of the purchasing public." *Tools USA & Equip. Co. v. Champ Frame Straightening Equip. Inc.*, 87 F.3d 654, 660 (4th Cir. 1996) (quoting *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1528 n. 3 (4th Cir. 1984)). Plaintiff has been manufacturing and selling retail products utilizing its unique design since 2016 online and in select retail stores throughout the United States. *See* Barnes Decl. ¶ 3. Plaintiff has invested significant time, money, and effort in developing and marketing the Shibumi Shade, which has resulted in significant commercial success and public recognition for its distinctive design, appearance, and trade dress. *See id.* ¶ 6. For example, the Shibumi Shade has been featured in the New York Times and Garden & Gun Magazine and in TV shows. *See id.* ¶ 4. As a result of Plaintiff's exclusive use of this design for more than five years, consumers associate it exclusively with

Plaintiff—when consumers see the design, they immediately believe that the products come from Plaintiff. *See H. Jay Spiegel & Assocs., P.C. v. Spiegel*, 652 F. Supp. 2d 630, 638 (E.D. Va. 2008) ("use in commerce for five years provides prima facie evidence of distinctiveness.") (citing 15 U.S.C. § 1052(f)). Further, Plaintiff's product has been very successful since it was first launched and has sold out every summer the Shibumi Shade has been offered for sale for the past five years. *See* Barnes Decl. ¶ 9. Due to its long-time success in the market, Plaintiff's trade dress has developed substantial goodwill among consumers, belonging exclusively to Plaintiff.

**c. <u>Defendants' Infringement Creates a Likelihood of Confusion</u>**

Where evidence suggests that a "newcomer copied its competitor's trade dress," the Fourth Circuit has "appl[ied] the presumption [of confusion] and consider[ed] (in the setting of an application for a preliminary injunction) whether the newcomer presented sufficient evidence to rebut the presumption." *Osem Food Indus. Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 165 (4th Cir. 1990). As discussed above, Plaintiff has presented substantial evidence showing that Defendants copied Plaintiff's trade dress in an attempt to make a lower quality and cost product and displace sales from Plaintiff. Defendants' copying here creates a presumption of confusion.

In determining whether a likelihood of confusion exists, the Fourth Circuit considers seven factors: (1) the strength of the plaintiffs mark; (2) the similarity between the plaintiffs mark and the alleged infringer's mark; (3) the similarity of the goods offered under the marks; (4) the channels of trade in which the goods offered under the marks are sold; (5) similarity of the methods of advertising used by both parties; (6) the intent of the alleged infringer; and (7) whether actual confusion has occurred. *See Pizzeria Uno Corp.*, 747 F.2d at 1527. The Fourth Circuit has "distilled other factors that may be considered relevant to analyzing the likelihood of

confusion, such as (8) the quality of the defendant's product; and (9) the sophistication of the consuming public." *Sara Lee Corp. v. Kayser-Roth Corp.,* 81 F.3d 455, 463-64 (4th Cir. 1996) (citations omitted). No single factor is dispositive. *See Pizzeria Uno,* 747 F.2d at 1527. In the instant case, analysis of these factors weigh heavily in Plaintiff's favor.

### *i. Strength of Shibumi Shade's Mark*

The strength of a mark can be established by commercial evidence similar to that discussed above with respect to secondary meaning, including long and exclusive use, record of sales success, media coverage, attempts at copying, and advertising efforts. *See George & Co., LLC v. Imagination Ent. Ltd.*, 575 F.3d 383, 395 (4th Cir. 2009). As discussed above, Plaintiff has made substantial investments in the development and marketing of its product over more than five years of continuous use, which has resulted in national media recognition of Plaintiff's design and year-over-year inventory sell-outs. Plaintiff's commercial success has also attracted copycats, such as Defendants, to rip off Plaintiff's design and sell a lower quality product at a lower cost to displace sales. Therefore, the first factor favors Plaintiff.

### *ii. Similarity of the Marks/Goods*

In *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 936 (4th Cir. 1995), the court held, "in evaluating the similarity of two marks, this Court has reasoned that the marks need only be sufficiently similar in appearance, with greater weight given to the dominant or salient portions of the marks." And when the products and services provided by the parties serve the same purpose, there is suggestion of likelihood of confusion. *Id.* at 937.

Here, as shown in the below side-by-side comparisons, the Accused Product copies the overall appearance of the Shibumi Shade and nearly all of its individual design elements. For example, the Accused Product includes the distinctive blue color of the Shibumi Shade. The

Accused Product features (a) a rectangular canopy that is attached only on one side to a frame, that floats freely in the wind on the other three sides, that bears two horizontal stripes and the color blue, and that is approximately 15 feet wide and 10 feet deep, (b) a frame consisting of pole segments that are secured to one other and that form a continuous curved frame, each of which is inserted into the sand, (c). with a cord extending from the center of the frame to an anchor, and (d) an anchor consisting of the canopy's carrying case filled with sand similar to the Shibumi Shade.











The suspended blue canopy design of the Accused Product (left) distinctively waves in the wind creating the same visual impression on consumers as the Shibumi Shade (right) when viewed on the beach. The Accused Product uses the same fabric as the Shibumi Shade, 100% polyester for

the canopy and a nylon carrying bag, is a similar size as the Shibumi Shade, approximately 16 feet wide and 9 feet long, and has a similar shade footprint as the Shibumi Shade. Overall, the design of the Accused Product is so similar to the highly distinctive design of the Shibumi Shade as to give consumers the false impression that the Accused Product originates from, is endorsed by, or is otherwise affiliated with the Shibumi Shade, thus leading to a high risk of consumer confusion, mistake, and deception as to the source of the Accused Product. Thus, the second and third factors favor Plaintiff.

***iii. Channels of Trade and Methods of Advertising***

Defendants market and sell the Accused Product to the same class of consumers—beachgoers—and sell through the same channels as Plaintiff sells its product, primarily online through the parties' respective websites and social media accounts. *See Garden & Gun, LLC v. TwoDalGals, LLC*, No. CIV 3:08CV349, 2008 WL 3925276, at *6 (W.D.N.C. Aug. 21, 2008) (identifying "similar advertising techniques in the form of websites, chatrooms and blogs.") (citations omitted). Both Plaintiff and Defendant also rely on Google advertisements to attract customers to their business. Barnes Decl. ¶ 11. Defendants even advertise the Accused Product using the same key words as the Shibumi Shade—including advertising the Beach Shade as the "Original Beach Shade," which it definitively is not. Barnes Decl. ¶ 17. And the advertising photographs shown above for both products reveal many similarities—from general depictions of sunny beach settings, down to the specific angles chosen to show the products. *See CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 273 (4th Cir. 2006) (considering "the appearance of the advertisements, and the content of the advertisements."). Accordingly, the fourth and fifth factors favor Plaintiff.

*iv. Defendants' Intent and Product Quality*

Plaintiff has presented ample evidence above that Defendants recognized the goodwill that Plaintiff had created in its product, and that Defendants intended to produce an admittedly lower quality version of the same product at a lower cost in order to displace Plaintiff's sales. So the sixth and eighth factors additionally favor Plaintiff.

*v. Actual Confusion and Sophistication by Consumers*

Actual confusion by consumers is one of the most significant factors to consider when evaluating the likelihood of confusion necessary for a finding of trademark infringement. *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001). In fact, "the existence of actual confusion is often dispositive to a trademark infringement analysis." *Id.* (citations omitted).

Since Defendants launched the Accused Product on May 24, 2021, Plaintiff has received and reviewed several comments from customers: 1) wanting to know the difference between Plaintiff's product and the Accused Product (Barnes Decl. Exhibits A-8 and A-9; 2) who think that the Accused Product is a "knock off" of the Shibumi Shade and has copied the Shibumi Shade "almost to the tee" (Barnes Decl. Exhibits A-10, A-11, and A-12; Barnes Decl. Ex. A-7 at 4; and 3) asking how the Accused Product compares to the Shibumi Shade on the Accused Product's Amazon listing (Barnes Decl. Ex. A-7 at 5). Barnes Decl. ¶¶ 20-23. Because these customers are not professionals or experts, they lack the sophistication to appreciate the quality disparity between the products and become confused as to the differences between the products. *See Teaching Co. Ltd. P'ship v. Unapix Ent., Inc.*, 87 F. Supp. 2d 567, 585 (E.D. Va. 2000) ("[T]here is no evidence that the consumers of TTC's and Unapix's products are highly-trained professionals or experts in purchasing educational products. Thus, the Court does not find that

they deserve consideration as sophisticated buyers.") (citation omitted). Plaintiff has certainly already lost sales to the Accused Product, with some customers viewing it as a directly competing albeit lower cost alternative to Plaintiff's product. Barnes Decl. Ex. A-13; Barnes Decl. ¶ 23. As such, the seventh and ninth factors favor Plaintiff.

Because Plaintiff's trade dress is primarily non-functional and has acquired secondary meaning, and because Defendants' infringement creates a likelihood of confusion, Plaintiff is likely to prevail on the merits of its trade dress infringement claim.

**B. Plaintiff Will Be Irreparably Harmed Absent Immediate Injunctive Relief.**

It is the start of the busy summer season, in North Carolina, along the Atlantic coast, and throughout the United States. Barnes Decl. ¶ 12. Demand for new, lightweight, durable, easy to assemble, and quality shades is peaking. Every day that goes by is invaluable. *Id.* Shibumi Shade is a highly seasonal business, and customers gained at this early summer stage are repeat customers in future years, so a lost sale now is a future of lost sales. *Id.*

Defendants' patent and trade dress infringement has already harmed Plaintiff's reputation and displaced sales, and Defendants' continued infringement will irreparably harm Plaintiff unless Defendants are enjoined immediately. In patent infringement cases, "[a] strong showing of likelihood of success on the merits coupled with continuing infringement raises a presumption of irreparable harm to the patentee." *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994) (citation omitted). Similarly, "[a] plaintiff seeking any such injunction [under the Lanham Act] shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits." 15 U.S.C. § 1116(a). As discussed above in Sections A.1 and A.2.c, Plaintiff has presented strong showings of patent infringement and likelihood of

confusion for trade dress infringement, respectively, based on Defendants' unauthorized and continuing and manufacture and sale of the Accused Product.

Moreover, Defendants' infringement impacts Plaintiff's goodwill and reputation with consumers, threatening a potential loss of customers and corresponding lost sales. *See NaturaLawn of Am., Inc. v. W. Grp., LLC*, 484 F. Supp. 2d 392, 401 (D. Md. 2007) ("Violation of a trademark is a claim especially suited to injunctive relief because it can result in irreparable harm where there is an inherent injury to the goodwill and reputation of the plaintiff.") (citation omitted); *see also* Barnes Decl. ¶¶ 24-25. Plaintiff has a reputation in the industry as an innovator. *Id.* ¶ 25. Defendants' intentional decision to introduce an inferior and lower quality product than Shibumi Shade poses a significant threat to that reputation. *See* Barnes Decl. ¶¶ 13, 15, 24-25. Allowing an inferior product to be sold on the market, when Plaintiff has taken great care to ensure that its products are made of the highest quality and customers have come to associate a certain quality with Plaintiff's products, will irreparably harm Plaintiff's reputation and goodwill. Barnes Decl. ¶¶ 24-25. Specifically, Defendants' continued unauthorized sale of the Accused Product has already caused and will likely continue to lead to a loss of sales due to customers who confuse Defendants as the distributor of Plaintiff's design and are upset with its lower quality and/or choose to purchase the lower-priced Accused Product over Plaintiff's product, not appreciating the disparity in quality between the two products. *Id.* Both situations harm Plaintiff's ability to continue to build the reputation and positive consumer perception of its product design. Defendants' concerted attempt to draw away current and prospective buyers of the Shibumi Shade by relying on the goodwill that Plaintiff has worked so hard to build has caused and will continue to cause irreparable damage to Plaintiff's standing in the marketplace. Defendants' sales of the Accused Product have and will continue to be sales lost to Plaintiff. *Id.*

The livelihoods of the approximately 100 employees in North Carolina and Virginia who work full time on Shibumi Shade product is also threatened by the existence of a copycat like Defendants that seeks to steal business from Plaintiff. *Id.* ¶¶ 3, 25.

Further, Mr. Finneran has stated in no uncertain terms that Beach Shade LLC has no assets and his (mistaken) belief that he could not be personally liable for any judgments issued against Beach Shade LLC, further highlighting the risk that Defendants are insolvent and Plaintiff will not be able to recover any monetary damages from Defendants' willful infringement. Barnes Decl. ¶ 16; *see also Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994), *abrogated on other grounds by Winter*, 555 U.S. 7 ("irreparable harm may still exist where. . . damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected.") (internal quotation marks and citations omitted). Finally, allowing Defendants to continue to sell such a blatant knockoff as the Beach Shade will erode Plaintiff's hard-won market share and will surely encourage other would-be infringers to follow suit, further opening Plaintiff up to unlawful copying and undermining the patent protection that Plaintiffs have worked so hard to secure. Barnes Decl. ¶ 25; *see Telebrands Direct Response Corp. v. Ovation Commc'ns, Inc.*, 802 F. Supp. 1169, 1178 (D.N.J. 1992) (finding irreparable harm where the defendant's "[unauthorized] use will also encourage other companies to infringe with similar 'knock-off' products and will disparage the reputation of the genuine Thighmaster product as it becomes intertwined in the consumer's mind with cheaper imitations") (citations omitted).

Accordingly, if injunctive relief is not granted, Plaintiff will continue to suffer immediate and ongoing irreparable harm.

### C. <u>The Balance of Hardships Weighs in Favor of Plaintiff.</u>

The balance of hardships clearly favors Plaintiff. Plaintiff has expended significant time and resources in securing their intellectual property rights and developing, marketing, and selling the Shibumi Shade. Barnes Decl. ¶¶ 5-6. To take away those rights, especially in light of the irreparable harm Plaintiffs will suffer if Defendants are permitted to continue to sell their infringing and inferior products, would be inequitable. *See Morris & Assocs., Inc. v. Cooling & Applied Tech., Inc.*, No. 5:09-CV-23-BR, 2010 WL 4484640, at *10 (E.D.N.C. July 30, 2010), *report and recommendation adopted*, No. 5:09-CV-00023-BR, 2010 WL 4483412 (E.D.N.C. Oct. 20, 2010) ("The most important protection of a patent is the right to exclude. . . . taking away the right to exclude from Plaintiff in this circumstance would be inequitable and tips the balance of the equities in Plaintiff's favor.") (citation omitted).

In contrast, Defendants only began selling the Accused Product less than one month ago. If Defendants are enjoined, Defendants can simply go back to the status quo as it existed one month ago. The fact that Defendants business and inventory is small has no impact on the balance of hardships. *See Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.*, 132 F.3d 701, 708 (Fed. Cir. 1997), *abrogated on other grounds by eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ("Small parties have no special right to infringe patents simply because they are small."). Further, "one who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008) (quotation marks and citation omitted). Defendants should not be rewarded for infringing Plaintiff's intellectual property. For at least these reasons, this factor favors issuing the injunction.

### D. <u>The Public Interest Favors Injunctive Relief.</u>

The "public is best served by enforcing patents that are likely valid and infringed." *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006). It is in the public interest to enforce patents and other intellectual property to encourage others to invest in the patent system. Plaintiff has properly sought and been granted multiple patents on its proprietary product, and Plaintiff is entitled to the Court's protection of its patents. "By affording a patentee the enforcement of a preliminary injunction when it has demonstrated likely validity and infringement, the court is 'further[ing] [the] public policy inherent in the patent laws designed to encourage useful inventions by rewarding the inventor with a period of market exclusivity.'" *Morris & Assocs., Inc.*, 2010 WL 4484640, at *10-11 (quoting *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1382 (Fed. Cir. 2005)). Further, "granting the preliminary injunction is in the public interest because the public could be deceived and confused by Defendants' unauthorized use of [Plaintiff's trade dress]." *Meineke Car Care Ctrs., Inc. v. Bia*, No. 3:11-cv-369-FDW-DCK, 2011 WL 4829420, at *6 (W.D.N.C. Oct. 12, 2011). The public interest factor weighs in favor of granting the injunction.

### E. <u>Plaintiff is Prepared to Post Security in an Amount Set by the Court</u>

The Court has the discretion to set the amount of security or waive the security requirement of Rule 65(c). *Pashby*, 709 F.3d at 332. The amount of the bond ordinarily depends on the gravity of the potential harm to the enjoined party. *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). A nominal bond is appropriate in some circumstances. *Id.* Plaintiff is prepared to post a bond in the event the Court determines one is warranted. In such a case, Plaintiff suggests that a nominal bond is sufficient to secure the injunctive relief sought.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's Motion for Temporary Restraining Order as set forth in the Proposed Order in order to maintain the status quo and prevent the ongoing and imminent irreparable harm being caused by the Defendants.

Dated: June 11, 2021

Respectfully submitted,

**WOMBLE BOND DICKINSON (US) LLP**

/s/ Samuel Hartzell
Samuel Hartzell
North Carolina Bar No. 49256
555 Fayetteville Street, Suite 1100
Raleigh, North Carolina 27601
Telephone: 919-755-2112
Facsimile: 919-755-6772
Sam.Hartzell@wbd-us.com

Preston H. Heard (*pro hac vice* to be filed)
Georgia Bar No. 476319
Lauren Baker (*pro hac vice* to be filed)
Georgia Bar No. 345536
271 17th Street, NW, Suite 2400
Atlanta, GA 30363
Telephone: (404) 862-7527
Facsimile: (404) 879-2966
Preston.heard@wbd-us.com
Telephone: (404) 888-7466
Lauren.Baker@wbd-us.com

*Attorneys for Plaintiff Shibumi Shade, Inc.*