**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**Civil Action No. 5:21-CV-00256-FL**

SHIBUMI SHADE, INC.,

                Plaintiff,

vs.

BEACH SHADE LLC and MATTHEW
FINNERAN,

                Defendants.

**DEFENDANTS' MEMORANDUM OF
LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR A PRELIMINARY
INJUNCTION**

# INDEX

I.     Summary of the Nature of the Case ……………………………………………………..1

II.    Statement of Facts ……………………………………………………………………….3

    A.  Background …………………………………………………………………………….3

    B.  Overview of the Patents and Asserted Claims ……………………………………....4

    C.  BSL's Product ………………………………………………………………………….7

III.    Argument …………………………..…………………………………………………….9

    A.  Standard of Review …………………………………………………………………….9

    B.  Plaintiff Has Failed to Show Likely Success on the Merits of its Claims ……………..9

        i.  Plaintiff has not Established that BSL's Product Likely Infringes Either Patent ...…10

            a.  Plaintiff has not established likely infringement of the '330 Patent ………...11

            b.  Plaintiff has not established likely infringement of the '117 Patent …...……15

            c.  Doctrine of Equivalents …………………………………………………..16

       ii.  Plaintiff has not established that BSL's Product Likely Infringes any Trade Dress ..17

            a.  Plaintiff's purported non-registered trade dress is entirely functional ……...18

            b.  Plaintiff has not shown any evidence of its trade dress ……………………..19

               acquiring secondary meaning

            c.  Plaintiff has not shown a likelihood of conduction exists …………..………20

    C.  Plaintiff Has Not Shown Irreparable Harm …………………………..…………….23

    D.  The Balance of the Equities and Public Interest Weigh Against an Injunction …………26

    E.  No Injunction Should be Granted Without a Large Bond ………………………………27

IV.    Conclusion …………………………………………………………………………...28

Defendants Beach Shade, LLC ("BSL") and Matthew Finneran ("Finneran") (collectively, "Defendants") file this memorandum in response and opposition to Plaintiff's motion for a preliminary injunction (the "Motion") (Dkt. 3)[1].  In support, Defendants file a Declaration of Matthew Finneran and a Declaration of David Sar.

## I.  SUMMARY OF THE NATURE OF THE CASE

Plaintiff seeks to stop BSL and its owner Matt Finneran from selling BSL's version of a two-leg beach shade.  Even though BSL's product is quite different from Plaintiff's patents and even though the products look very different, Plaintiff alleges patent and trade dress infringement.

Plaintiff did not invent either the beach umbrella or the arched beach shade.  *See, e.g.*, (Declaration of David Sar (hereafter "Sar Decl.") Ex. 1, US Pat. No. 2,195,391 ("*Hunter*"), filed May 21, 1937; Sar Decl. Ex. 2, Suniela YouTube video posted in 2015, at https://www.youtube.com/watch ?v=YKKgoGl-Xus (last visited July 13, 2021)).

 

Plaintiff did not even invent the 2-legged, arched shade with an anchor, *see, e.g.*, (Sar Decl. Ex. 3, US Pat. No. 7,789,097 ("*Sotirkys*"), filed Aug. 15, 2008), or the arched shade where the canopy attaches

---

[1] Plaintiff's Emergency Motion for Temporary Restraining Order (Dkt. 3) was converted to a motion for preliminary injunction. (Dkt. 18).

to the arched frame(s) without any other frame structures. *See* (Sar Decl. Ex 4, "How to Set up a butterfly arch" video, posted on YouTube in 2012[2]).

 

Accordingly, the two patents Plaintiff received are on very narrow inventions with very detailed requirements. Among other elements, they require: a cord that couples to the interior of an anchor container, a single continuous frame, and a cable running through all of the frame segments from one beach-touching end to the other. Defendants' product does not satisfy those specific requirements and consequently Plaintiff is not likely to prevail on its patent claims.

Plaintiff also fails to show a likelihood of success for its trade dress claim. Its product's overall shape – an arch connected to the canopy and with the counterweight and tension cord – is functional and unprotectable as trade dress, as witnessed by the fact that Plaintiff obtained utility patents on it. The only non-functional portion of the product's dress happens to be the most striking visual portion – the "flag-like" canopy, which looks nothing like Defendants' product. (Dkt. 1, Complaint (hereafter "Compl.") at ¶ 19).

---

[2] A full copy of the video can be viewed here: https://www.youtube.com/watch?v=FOTYtjQAL4s (last visited July 14, 2021).

 

In the instant Motion, Plaintiff asks the Court to exercise its extraordinary equitable powers on very weak claims to shut down Defendants' entire business and to change what was the status quo before the Motion was filed, despite failing to show that it would suffer irreparable harm and such action not being in the public interest or equitable. Plaintiff's Motion should be denied.

## II.      STATEMENT OF FACTS

### A. Background

BSL is a North Carolina limited liability company. (Declaration of Matt Finneran (hereafter "Finneran Decl.") at ¶ 4). Finneran is the Chief Executive Officer of BSL. (*Id.* at ¶ 3). BSL sells outdoor canopy products designed to provide shade from the sun. (*Id.* at ¶ 5). It currently manufactures, distributes, and sells a single product, the Beach Shade Canopy (the "BSL Product"). (*Id.* at ¶ 6). It began selling the BSL Product this year and has sold approximately 900 units. (*Id.* at ¶ 7). Based on projections, BSL expected to sell in excess of one million dollars' worth of the BSL Product in 2021. (*Id.* at ¶ 11).

On May 27, 2021, BSL received a cease and desist letter from Plaintiff, demanding that BSL stop selling the BSL Product. (*Id.* at ¶ 15). The letter accused BSL of infringing Plaintiff's patents and trade dress for the Shibumi Shade. (Dkt. 5-5, Declaration of Dane Barnes (hereafter "Barnes Decl.") Ex. A-4). BSL has never infringed Plaintiff's – or any other company's – intellectual property. (Finneran Decl. at ¶ 18).

Following receipt of the letter from Plaintiff, Finneran, on behalf of BSL, reached out to Dane Barnes about meeting to discuss a potential resolution to the dispute between BSL and Plaintiff. (*Id.* at ¶ 15). On June 3, 2021, Finneran met with Mr. Barnes and his brother, Scott. (*Id.*). At all times, it was Finneran's understanding that the meeting was to be an attempt to discuss a resolution and potential settlement between the parties. (*Id.*). At no point did Finneran ever state that BSL was intentionally infringing Plaintiff's product. (*Id.* at ¶ 18). The parties were unable to resolve their dispute at the June 3 meeting, and on June 11, 2021, Plaintiff filed this lawsuit, asserting that BSL and Finneran had infringed two of Plaintiff's patents and Plaintiff's trade dress.

## B. Overview of the Patents and Asserted Claims.

Plaintiff's two asserted patents claim priority to a provisional application filed on October 18, 2016. *See* (Dkt. 1-7 at 1:6-9[3]; Dkt. 1-9 at 1:6-9). Asserted US Patent No. 10,190,330 (the "'330 Patent") was issued on January 29, 2019 after rejections from the Patent Office's examiner and corresponding changes to its claims. Asserted US Patent No. 10,752,117 (the "'117 Patent") was issued on August 25, 2020, similarly after rejections and changes. Plaintiff asserts infringement of only claim 1 of each patent.

During the prosecution of the '330 Patent, the examiner refused claims in the application due to, among other things, the *Sotirkys* Patent, provided as Ex. 3 to the Declaration of David Sar. To the right is Fig. 2 of *Sotirkys*. The examiner wrote that *Sotirkys* taught, among other things, a system for providing shade comprising a canopy aerially suspended by a frame having a plurality of sections engaged end-to-end by an interior cable, along with a cord coupled to an anchor and also having a container. (Sar Decl. Ex. 5, '330 Patent File History at 78-79, Rejection § 3, *et seq.* & at 41). To address the rejection, the



---

[3] References to text in the patents are in the form of "patent column(s): line number(s)."

Plaintiff[4] added, among other things, the language "single, continuous[] linear frame" and argued that it provided a "lightweight system that is easier to transport, assemble, disassemble and pack compared with the prior art shading systems." (*Id.* at 52). The examiner again rejected the claims, (*id.* at 38-41), because, among other things, it was anticipated by US Patent 9,051,755 ("*Heining*"), which taught a shade system comprised of a "single, continuously linear frame (104/106a-e) comprised essentially of … a plurality of sections coupled into end-to-end alignment from a first end to a second end," with the frame slid through loops of a canopy. (*Id.* at 41). To overcome the refusal, Plaintiff removed the word "linear" and added claim elements 1d and 1e below requiring the frame to be tethered to the anchor by connecting to the interior of the container. (*Id.* at 29).

As issued, claim 1 of the '330 Patent (emphasis added) provides:

1.      A system for providing shade onto a surface, comprising:

[1a] a canopy configured for engagement with, and complete aerial suspension by, a <u>single, continuous frame</u>,

[1b] wherein the frame consists essentially of a plurality of sections configured for end-to-end alignment from a left end to a right end, wherein each section is configured to engage with any adjacent sections,

[1c] wherein the left end and the right end are configured to be secured to the surface for aerially supporting the frame and completely suspending the canopy aerially, and

[1d] a container for housing and transporting all of the other components of the system, wherein the container is also an anchor for housing weight,

[1e] a cord selectively engaged or coupled to an <u>interior of the container</u> for inverting the container to serve as the anchor for housing weight, the cord selectively engageable or coupled to the frame.

(Dkt. 1-7 at 7:66-8:18).

For the '117 Patent, Plaintiff retained a different law firm (which represents it in this lawsuit) and changed the wording of its patent claims, despite claiming priority to the original provisional application.

---

[4] "Plaintiff" is used rather than "applicant" or "patentee" as Plaintiff purports to have been assigned both asserted patents during their prosecution (or application) and before issuance. Actions of it, or its inventor or counsel, during prosecution are charged to Plaintiff.

This time, the examiner rejected claims as being, among other things, anticipated by a "How to set up a butterfly arch" video posted to YouTube in 2012 ("*Butterfly*"). (Sar Decl. Ex. 6, '117 Patent File History at 146-149; Sar Decl. Ex. 4).



The examiner wrote that *Butterfly* taught a system for providing shade comprised of the canopy extending from a frame comprised of "longitudinally-extending sections" where the first end and the opposing second end of the frame are each engaged with the surface. (Sar Decl. Ex. 6 at 146-148). The examiner wrote that it would have been obvious to one of ordinary skill in the art "to modify the device of Butterfly by using a frame with a pole including a cable extending therethrough as taught by *Sotirkys* in order to allow the user to more compactly fold the frame." (*Id.* at 149).

Plaintiff amended its claims, with argument, to recite that its cable running through the frame, unlike Butterfly and *Sotirkys*, extended through the "plurality of longitudinally-extending sections of the frame from the first end of the first longitudinally-extending section to the first end of the second longitudinally-extending section and any of the at least one [sic] intermediate longitudinally-extending sections arranged therebetween so that when the first end of the first longitudinally-extending section and the first end of the second-longitudinally extending section are directly engaged with the surface, the cable is configured to lie within the plane substantially perpendicular to the surface." (*Id.* at 136). Plaintiff's patent thus requires that the interior cable run all the way from the left-most section to the right-most section, running through the intermediate sections along the way.

As issued, asserted claim 1 of the '117 Patent (emphasis added) provides:

1.     A system for providing shade onto a surface, the system comprising:

   [1a] a frame being directly engageable with the surface such that when the frame is directly engaged with the surface, the frame is configured to lie within a plane substantially perpendicular to the surface, wherein the frame comprises a

plurality of longitudinally-extending sections arrangeable so that a first longitudinally-extending section and a second longitudinally-extending section are each directly engaged with the surface at first ends thereof and are coupleable to one another about opposing, second ends or are each respectively coupleable to first and second ends of at least one intermediate longitudinally-extending section arranged therebetween;

[1b] a cable extending through the plurality of longitudinally-extending sections of the frame from the first end of the first longitudinally-extending section to the first end of the second longitudinally-extending section and any of the at least one intermediate longitudinally-extending sections arranged therebetween so that when the first end of the first longitudinally-extending section and the first end of the second-longitudinally extending section are directly engaged with the surface, the cable is configured to lie within the plane substantially perpendicular to the surface;

[1c] a canopy extending between a suspension end and an opposing trailing end, the suspension end of the canopy being coupleable with the frame about a portion of the frame defined between the first ends of the first and second longitudinally-extending sections, wherein the trailing end of the canopy is spaced apart from the portion of the frame such that when a wind force is applied to the canopy, the canopy extends at an angle relative to the plane, the angle being non-coplanar with the plane and varying with the wind force;

[1d] a cord having a first end and a second end, the first end or the second end of the cord being coupleable to the frame; and

[1e] an anchor coupleable to the other of the second end or the first end of the cord and being in contact with the surface at an angle relative to the plane so that the frame remains substantially within the plane when the wind force is applied to the canopy.

## C. BSL's Product

Finneran describes BSL's Beach Shade Canopy product (the "BSL Product") in his Declaration. (Finneran Decl. at ¶¶ 19-31). It has two identical support poles generally forming the left and right portions of the arch. (*Id.* at ¶ 21). Two shock cords (one per pole) run through the respective support poles in order to connect each pole's internal sections. (*Id.* at ¶ 23). The shock cord in the left pole and the cord in the right pole never touch and are not the same shock cord. (*Id.*). Further, when assembled, even the left and right poles are separated by a center connector; the poles never touch each other and of course their shock cords never touch. (*Id.* at ¶ 24). The poles are physically blocked from being any closer than approximately two inches apart. (*Id.*). Another cord, a tension cord, is tied to the center connector and runs to the carrying case. (*Id.* at ¶ 27). That tension cord connects to a loop on the exterior

– not the interior - of the bag via a carabiner.  (*Id.* at ¶ 27).  The exterior of the bag bears the Beach Shade name and logo, facing outward.  (*Id.* at ¶ 28).  When the product is properly assembled and the bag is filled with sand, the bag is neither turned inside out nor upside down.  (*Id.* ¶ 29).  Below is an image from BSL's Product Assembly Guide:





(*Id.* Ex. 1, Product Assembly Guide).   If the bag were turned inside-out, as speculated by Plaintiff, the sand would block or impair functionality. (*Id.* at ¶ 29).

The canopy of the BSL Product is lightweight and designed to connect to the two support poles on only one side.  (*Id.* at ¶ 30). This allows the canopy to be lifted by the wind, which creates a shaded surface. (*Id.*). The canopy is a rectangular shape in order to maximize the size of the shaded surface. (*Id.*).  The canopy is predominantly an Ensign blue with two horizontal Faded Denim blue stripes on each side when viewed from the side of the BSL Product.  (*Id.*).  The name BEACH SHADE and BSL's logo are featured prominently on those Faded Denim stripes. (*Id.*).  While the BSL Product is sold at a lower price point than the Shibumi Shade, it is in no way an inferior product.  (*Id.* at ¶ 33).

BSL's only product is the BSL Product. (*Id.* at ¶ 6). If BSL were unable to sell the BSL Product, it would be unable to generate revenue which would likely cause BSL to cease operations. (*Id.* at ¶ 9).

### III. ARGUMENT

**A.      Standard of Review**

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. . . . [and] is never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 22, 24 (2008) (noting that a court must consider (1) whether plaintiff is likely to succeed on the merits, (2) whether plaintiff would be irreparably harmed without an injunction, (3) whether the balance of equities favors injunction, and (4) whether the public interest would be served by injunctive relief).  While granting a preliminary injunction requires analysis of all four factors, "a trial court may . . . deny a motion based on a patentee's failure to show any one of the four factors—especially either of the first two—without analyzing the others." *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1356 (Fed. Cir. 2002).[5] And "a movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (emphasis in original).

While Fourth Circuit, rather than Federal Circuit, case law guides the analysis as to a trade dress claim, both Circuits utilize the same test for considering whether to grant a motion for a preliminary injunction.  *E.g.*, *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014).

**B.      Plaintiff Has Failed to Show Likely Success on the Merits of its Claims.**

To establish a likelihood of success on the merits, a plaintiff seeking a preliminary injunction in a patent infringement suit must show that it "will likely prove infringement" and that it "will likely withstand challenges, if any, to the validity of the patent." *Titan Tire Corp. v. Case New Holland, Inc.*,

---

[5]  When deciding a preliminary injunction motion in a patent infringement action, the analysis is subject to the law of the regional circuit in which the district court sits, but Federal Circuit precedent controls on all patent-specific issues.  *See Murata Mach. USA v. Daifuku Co.*, 830 F.3d 1357, 1363 (Fed. Cir. 2016).

566 F.3d 1372, 1376 (Fed. Cir. 2009) (citing *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1364 (Fed. Cir. 1997)).[6]

To establish a likelihood of success on the merits of a trade dress claim, a plaintiff must be able to establish "three elements: (1) the alleged trade dress is primarily nonfunctional; (2) its alleged trade dress is inherently distinctive or has acquired secondary meaning; and (3) the alleged infringement creates a likelihood of confusion." *Gildan USA Inc. v. Dillard's, Inc.*, 2015 WL 1345260, at *2 (W.D.N.C. Mar. 23, 2015) (*citing Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654, 657 (4th Cir. 1996)).

> ***1.    Plaintiff has not established that BSL's product likely infringes either patent.***

Patent "infringement entails a two-step analysis." *Edge-Works Mfg. Co. v. HSG, LLC*, 285 F.Supp.3d 883, 892 (E.D.N.C. 2018) (denying injunction motion). "First, the court determines the scope and meaning of the patent claims asserted . . . and then the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (*en banc*) (citations omitted); *see also Eckchian v. Home Depot, Inc.*, 104 F.3d 1299, 1302 (Fed. Cir. 1997); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995); *Edge-Works*, 285 F. Supp. 23 at 892.

 "Claim construction seeks to ascribe the ordinary and customary meaning to claim terms as a person of ordinary skill in the art would have understood them at the time of the invention." *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1310 (Fed. Cir. 2017). "To ascertain the meaning of claims," the court considers primarily the "intrinsic record," comprised of "the [patent's] claim[], the specification [recited in the patent], and the prosecution history." *Markman*, 52 F.3d at 979; *Phillips*, 415 F.3d at 1313; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 158 (Fed. Cir. 1996). Secondarily, the court may consider "extrinsic evidence" in the form of expert testimony, technical information and

---

[6] For this motion Defendants do not contest the validity of the '330 and '117 Patents, although Defendants reserve the right to contest their validity in this lawsuit for other purposes other than this motion.

dictionaries.  *Id.*  "[A]n inventor may choose to be his own lexicographer if he defines the specific terms used to describe the invention with reasonable clarity, deliberateness, and precision," however, typically "[i]n the absence of an express intent to impart a novel meaning to claim terms, an inventor's claim terms take on their ordinary meaning."  *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002).  *See also Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 857 Fed. Cir. 2014) (quoting *Vitronics* and noting "a construction that excludes a preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support") (internal quotation marks omitted).

In the second step of the infringement analysis, the Plaintiff must show that each element (also called a limitation) of the patent claim is present in the accused device literally or under the doctrine of equivalents.  *See Catalina Marketing Int'l v. Coolsavings.com*, 289 F.3d 801, 812 (Fed. Cir. 2002); see also *TIP Systems, LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1379 (Fed. Cir. 2008) (explaining that likely infringement requires showing that accused product contains each and every element of asserted claim under long-established "all elements rule").

Courts must be particularly careful not to read out claim terms that were added for the purpose of overcoming a patentability objection.  Prosecution disclaimer occurs when a patentee, either through argument or amendment, surrenders claim scope during the course of prosecution.  *Heuft Systemtechnik GmbH v. Indus. Dynamics Co.,* 282 F. App'x 836, 839 (Fed. Cir. 2008).  Such a disclaimer may arise from actions taken during the prosecution of the parent application.  *Id*. at 841-42. Subject matter "surrendered to acquire the patent cannot be recaptured by the doctrine of equivalents."  *Ottah v. Fiat Chrysler*, 884 F.3d 1135, 1140 (Fed. Cir. 2018).

> a.  Plaintiff has not established likely infringement of the '330 Patent.

**"*Interior*"** / **"*interior of the container*"**:  Claim 1 of the '330 Patent requires "a cord selectively engaged or coupled to an interior of the container for inverting the container to serve as the anchor…." (Dkt. 1-7 at 8, 14-16).  This language was added in response to the examiner's refusal.  (Sar Decl. Ex. 5 at 29, 38-41).

The widely accepted definition of "interior" is the "internal portion or inside" of something. (Sar Decl. Ex. 7 *Webster's Third New International Dictionary* (2002)). *See also LEGO Sys. A/S v. Rubicon Comnc'ns, LP*, 2017 WL 4280866 at *11 (D. Conn. Sept. 27, 2017) (noting that a common definition of interior is "the internal or interior part of a thing"). Consistently, the patent specification uses "interior of the container," (Dkt. 1-7 at 6:49), in close proximity to and in comparison to the phrase "exterior of the container," (*Id.* at 6:54-56). The use of this contrasting language confirms the plain and ordinary understanding that the cord connects to the anchor container through a connection on the container's inside rather than its exterior. The patent also includes an embodiment wherein the container includes an "interior compartment for housing the sections separate from the canopy." (*Id.* at 2:49-51). Consistently, "interior" must be referring the inside of the bag in its usual transport configuration before one turns it inside out to be filled with sand.

Further, the next few words of the claim ("for inverting the container") reference turning the bag inside-out so that when sand fills the bag, one can still couple the tension cord to the loop, which is now outward because the "interior" has been flipped inside out. The specification further asserts, "the container may be inverted for housing weight for ensuring that minimal amounts of the weight remain in the container once re-inverted so that the contents of the system are not disturbed by any weight during transportation and/or storage of the system." (*Id.* at 6:43-48). Consistently, the patent asserts as an embodiment the version wherein the "cord is attached to an interior bottom of the container for inverting the container to serve as the anchor…." (*Id.* at 2:45-47). In other words, when you leave the beach, you dump out the sand and re-invert the bag so that sand is not left to interfere with the components you are putting back in the bag. With this in mind, it is clear that the connection point for the tension cord must be on the true interior of the bag – before the bag is inside-outed and filled with sand. The patent's claim language, specification and embodiments all demonstrate this.

This "interior" element is not satisfied by BSL's product. BSL's tension cord connects to a carabiner which connects to a loop on the *exterior* of the bag. (Finneran Decl. at ¶¶ 27-28). As conceded by Plaintiff, (Dkt. 4-7 at 9), BSL's connection loop is on the same surface of the bag as its Beach Shade

branding which is obviously outward facing (not inward facing) so as to be visible to consumers and others. To instead find this claim element satisfied, one would need to violate the cannon of construction against ignoring a word – here, "interior." *See Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1340 (Fed. Cir. 2016) (refusing to accept claim construction that would "obviate the import" of disputed term); *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) ("[I]nterpretations that render some portion of the claim language superfluous are disfavored.").

Plaintiff's claim chart, (Dkt. 4-7 at 9), suggests without support that some users of the BSL Product might ignore the fact that the connection loop is on the BSL exterior of the bag, take it upon themselves to turn the bag inside-out, fill the bag partly with sand and try to couple the tension cord to the exterior loop which Plaintiff claims might now be "re-oriented" to the temporary interior of the bag. This would impair the functionality of the product. (Finneran Decl. at ¶ 29). Further, Plaintiff offers no factual support for this contorted view of the bag's orientation. Beach Shade's Product Assembly Sheet does not instruct users to do this. (*Id.* Ex. 1). And, this speculation that flips the meanings of interior and exterior runs counter to how the '330 Patent uses the terms consistently whether the bag is inverted or not. Thus, the BSL Product's cord does not engage or couple to the interior of the container, and Plaintiff has not satisfied its burden to show infringement is likely.

*"**Single**" and "**Continuous**" / "**single, continuous frame**"*: Claim 1 of the '330 Patent requires that its system include a canopy configured for engagement with a "single, continuous frame." (Dkt. 1-7 at 8:2). The patentee did not supply in its patent definitions of "single" or "continuous," rather this language was added in response to the examiner's refusals due to *Sotirkys* and *Heining*. Component 1a provides that the single, continuous frame has a plurality of sections configured for end-to-end alignment from a left end (touching the beach) to a right end (touching the beach). Fig. 1 of the '330 Patent shows a frame having no separated parts, even if the internal sections may be rotated while still being connected to other sections via the internal cable. Importantly, Fig. 2 – a "front view of the frame in a transport

13

configuration," (Dkt. 1-7 at 3:17-18) – shows that the frame is entirely connected by its interior cable. Thus, there is one single frame, not two frames, which is consistent with the use of the singular rather than plural in both claim 1 and the specification. *See e.g.*, (*id.* at 8:2, 3:67, 5:6, 5:26). The specification further explains that the sections are all connected by the cable "extending through the plurality of sections of the frame from the left end to the right end," (*id.* at 5:39-40), even in transport configuration, (*id.* at 5:50-53). Reasons for this single, continuous frame are obvious and outlined in the patent – to aid with convenient transport and assembly, (*id.* at 1:28), and to aid with keeping the canopy attached, (*id.* at 4:30-34, 5:6-22). Thus, intrinsic evidence shows that "single, continuous frame" means a lone, undivided frame that is uninterrupted by a space or gap, no matter whether erected or in transport configuration.

Extrinsic evidence from a dictionary confirms the plain and ordinary understanding that "single" means "consisting of or having only one undivided part as contrasted with double or many" and that "continuous" means "characterized by uninterrupted extension in space; stretching on without break or interruption." (Sar Decl. Exs. 8 & 9, *Webster's Third New International Dictionary* (2002)). *See also Altria Client Servs. LLC v. R.J. Reynolds Vapor Co.*, No. 1:20CV472, 2021 WL 1909594, at *6 (M.D.N.C. May 12, 2021) (continuous means uninterrupted). Thus, "single, continuous frame" requires one, uninterrupted span of frame, which the remainder of claim 1 requires to extend from one beach-touching end to the other beach-touching end.

Plaintiff added this language in order to differentiate its claimed invention from the *Sotirkys* device which had multiple frame segments, arguing that Plaintiff's device was easier to transport, assemble and disassemble. Plaintiff thereby ceded from claim 1 the subject matter of a shade having a frame when the frame is other than a lone, continuous frame.

BSL's product does not satisfy this element. BSL's device has two poles (each with their own interior shock cords and sections) plus the connector. (Finneran Decl. at ¶¶ 21-26). Plaintiff's claim chart recognizes that the BSL Product includes two poles which are separated, both when assembled, *See* (Dkt. 4-7 at 3) (photo showing gap in the middle), and when disassembled, (Dkt. 4-7 at 4) (photo showing

space between the poles). The poles never touch each other when the product is assembled. (Finneran Decl. at ¶ 24).

b. Plaintiff has not established likely infringement of the '117 Patent.

Claim 1 of '117 Patent requires, among other things, a "cable extending through the plurality of longitudinally-extending sections of the frame from the first end of the first longitudinally-extending section to the first end of the second longitudinally-extending section …" (Dkt. 1-9 at 8:14-17). The specification of the patent identifies that the "the first longitudinally-extending section" and "the second longitudinally-extending section" mean, among the particular sections aligned end-to-end to form the frame, the left section touching the surface (beach) and the right section touching the surface (beach). (*Id.* at 5:6-11). Fig. 2, showing the transport configuration of the frame, depicts even more clearly what this language means. It shows the cable extending without interruption from the "first section" (item 64 in the patent) of the frame to the "second section" (item 66 in the patent) of the frame and running through the intermediate sections. The specification states that cable extends "through the plurality of sections of the frame from the left end to the right end." ('117 Patent at 5:38-40). Claim 1 therefore requires that a cable extend through all the sections of frame from the first section which touches the surface/beach on one side to the section at the other end touching the surface/beach.

This language was added in response to the examiner's refusal based upon *Butterfly*. This prosecution history precludes the '117 Patent from being construed to read on products lacking a cable extending through the frame from one surface-touching section to the second surface-touching section. *Heuft Systemtechnik,,* 282 F. App'x at 842 (holding that changes in claim language to avoid rejections in the parent application prevent patentee from claiming infringement of the child patent based on disclaimed subject matter).

BSL's product lacks a cable extending from one surface-touching section to second surface-touching section at the other end of the arch. Instead, BSL's two shock cords each stop at the respective sections which go into the center connector. (Finneran Decl. at ¶¶ 25-26). The two shock cords never connect. (*Id.* at ¶ 26). Accordingly, BSL's product neither infringes nor likely infringes.

In its claim chart, Plaintiff erroneously contends that BSL's "cable likewise extends through the molded fitting arranged between the two collapsible poles." (Dkt. 4-8 at 8). It does not. (Finneran Decl. at ¶ 25). At a minimum, Plaintiff has not carried its burden of establishing likely infringement.

        c.   Doctrine of Equivalents

In order to establish infringement under the doctrine of equivalents, a plaintiff must show, at least, that any differences between the accused product and the patent claims are insubstantial. *Mas-Hamilton Group v. LaGard Inc.*, 156 F.3d 1206, 1212 (Fed. Cir. 1998); *Edge-Works*, 285 F. Supp. 3d at 893. To determine substantiality, courts consider whether the "two devices do the same work in substantially the same way, and accomplish substantially the same results . . . even though they differ in name, form or shape." *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605, 608, 70 S. Ct. 854, 856, 94 L. Ed. 1097 (1950).

If "claim scope is relinquished during prosecution on grounds of patentability, the doctrine of prosecution history estoppel provides that the relinquished scope can not be recovered by operation of the doctrine of equivalents." *Merck & Co. v. Mylan Pharm., Inc.*, 190 F.3d 1335, 1340 (Fed. Cir. 1990). "[A] patentee who has altered or delimited his claims during the patent application process is bound by his limitations, and he cannot thereafter recapture what he has disclaimed against any equivalents." *Long Mfg. Co. v. Lilliston Implement Co.*, 328 F. Supp. 268, 279 (E.D.N.C. 1971), *aff'd,* 457 F.2d 1317 (4th Cir. 1972); *see also L.B. Plastics, Inc. v. Amerimax Home Prod., Inc.*, 431 F. Supp. 2d 578, 583 (W.D.N.C. 2006), *aff'd,* 499 F.3d 1303 (Fed. Cir. 2007) (*citing Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 31, 117 S. Ct. 1040, 1050, 137 L. Ed. 2d 146 (1997)).

In its brief, Plaintiff supplies no arguments about equivalent infringement. For the '330 Patent, Plaintiff has not demonstrated that (1) connecting the tension cord to the exterior of the bag and (2) inserting two poles into a connector to create a frame perform substantially the same functions as the invention, which claims (1) selectively engaging or a coupling a cord to the interior of the container and (2) a single, continuous frame. These differences render the BSL Product less likely to achieve Plaintiff's stated functions of minimizing sand in the bag during housing and transportation, (Dkt. 1-7 at 6:43-48),

and of having fewer parts and steps required during setup, (*id.* at 1:28-29). Therefore they are not equivalent.

Further, Plaintiff relinquished subject matter of shades failing to have a cord connecting to the container's interior or failing to have a single, continuous frame. (Sar Decl. Ex. 5 at 29, 52). Plaintiff's original claims would likely have encompassed shades with cords connecting to the exterior of the anchor container or that had multiple or non-continuous frames, but Plaintiff ceded such subject matter in order to gain Patent Office approval. Plaintiff is estopped from recapturing what it already gave up.

Similarly, for the '117 Patent, Plaintiff has not demonstrated the equivalency of Plaintiff's one-cable system to BSL's two shock cord system. Such differences render the product less likely to achieve Plaintiff's stated functions of having fewer parts and steps required during setup, (Dkt. 1-9 at 1:28-29). And, similarly, Plaintiff added this language in order to obtain the patent despite the examiner's refusal. (Sar Decl. Ex. 6 at 136). Estoppel bars a claimed equivalency.

### 2. *Plaintiff has not established that BSL's product likely infringes any trade dress.*

Trade dress "involves the total image of a product, and may include features such as size, shape, color or color combinations, textures, graphics, or even particular sales techniques." *Tools USA*, 87 F.3d at 654 (*citing Two Pesos, Inc. v. Taco Cabana*, 505 U.S. 763, 764 n.1 (1992)). The Lanham Act protects both registered and unregistered trade dress, however, "in an action for trade dress infringement where the trade dress in question is not registered, the plaintiff [] bears the burden of proving that the matter for which he seeks protection is not functional." *Campbell Sales Group, Inc. v. Gramercy Park Design, LLC*, 2010 WL 3945350, at *4 (M.D.N.C. Oct. 6, 2010) (*citing* 15 U.S.C. § 1125).

Here, Plaintiff asserts that its trade dress "consists of the overall appearance of its product and the general impression created thereby," but points to an amalgamation of various unprotectable components of the Shibumi Shade, including the various functional components of the product, such as its pole, canopy, and anchor. (Compl. at ¶ 17). Plaintiff's only registered trade dress, which is located on the supplemental register under U.S. Reg. 6,009,936, describes "the color(s) royal blue and teal" as features of Plaintiff's mark. (Sar Decl. Ex. 10 at 9). The registered trade dress "consists of the color royal blue as

applied to a first section of a canopy and the color teal as applied to a second adjoining section of a canopy." (*Id.*). Thus, Plaintiff's only registered trade dress involves the colors arranged on the canopy.

> a. Plaintiff's Purported Non-Registered Trade Dress is Entirely Functional.

"[T]he critical functionality inquiry is not whether each individual component of the trade dress is functional, but rather whether the trade dress as a whole is functional." *Tools USA*, 87 F.3d at 658. "Generally speaking, trade dress is considered non-functional if it is not essential to the use or purpose of the product or if it does not affect the cost or quality of the product." *Lance Mfg., LLC v. Voortman Cookies Ltd.*, 617 F. Supp. 2d 424, 432 (W.D.N.C. 2009) (*citing Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 165 (1995)). Indeed, "product design almost invariably serves purposes other than source identification." *TraFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001) (internal quotation omitted). For that reason, "[a] utility patent is strong evidence that the features therein claimed are functional." *Id.* Thus, where a utility patent "claim[s] the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device." *Id.*

Here, each and every component of Plaintiff's alleged non-registered trade dress is purely functional. The following table sets out each of the non-registered components which Plaintiff contends make up its trade dress which are disclosed by Plaintiff's two utility patents:

| Alleged Non-Registered Trade Dress | Examples Where Component is Disclosed in Utility Patents |
|---|---|
| The polyester canopy that is attached to a frame only on one side and floats freely on the other sides (Compl., ¶¶ 46-47). | '330 Patent:  Fig. 1; 1:48-55; 3:64-4:9; Cl. 1<br><br>'117 Patent: Fig. 1; 1:58-63; 3:64-4:6; 4:7-11; Cl. 1 |
| The characteristics of the canopy, including the shade it creates, its shape, and the manner in which it blows in the wind (*Id.*, ¶¶ 46-48). | '330 Patent: Fig. 1; 1:31-34; 1:48-55; 4:24-25; Cl. 1<br><br>'117 Patent: Fig. 1; 3:64-4:6; Cl. 1 |
| The frame consisting of pole segments that are secured to one other and that form a continuous curved frame (*Id.*, ¶ 46). | '330 Patent: 1:48-54; 5:6-23; Fig. 1; Cl. 1<br><br>'117 Patent: Fig. 1; 1:58-63; 4:7-11; Cl. 1 |
| The cord extending from the center of the frame to an anchor (*Id.*). | '330 Patent: 2:2-4; 2:40-43;Fig. 1; Cl. 1<br><br>'117 Patent: Fig. 1; 2:1-4; Cl. 1 |
| The anchor made by the canopy's carrying case which can be filled with sand (*Id.*, ¶ 46-47). | '330 Patent: 2:40-44; Fig. 1; Fig. 5; Cl. 1<br><br>'117 Patent: Fig. 1; Fig. 5; 2:1-4; Cl. 1 |

Plaintiff's own utility patents reveal the functional nature of the components it claims constitute protectable trade dress. Accordingly, these elements are functional and not subject to trade dress protection. *See TraFix*, 532 U.S. at 29.

Even if these components were not disclosed by the utility patents, they would unquestionably be functional components as they are "essential to the use or purpose of the product." *Tools USA*, 87 F.3d at 658.  The rectangular, polyester canopy which blows in the wind is essential to providing the system of shade which is the purpose of the product.  The frame and accompanying anchor are both essential to the functioning of the product, as they are necessary to support the canopy and create the shaded area.  As a result, none of these alleged unregistered components can be protectable trade dress as a matter of law.

      b.      <u>Plaintiff's Has Not Shown Any Evidence of its Trade Dress Acquiring Secondary Meaning.</u>

Plaintiff fails to establish that its alleged trade dress has acquired secondary meaning.  "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *M. Kramer*

*Mfg. Co., Inc. v. Andrews*, 783, F.2d 421, 449 (4th Cir. 1986) (internal quotation omitted).  In determining whether a product's trade dress has acquired secondary meaning, "a court considers four factors: "(1) long use; (2) advertising; (3) sales volume; and (4) identity of service or origin in the minds of the purchasing public." *Tools USA*, 87 F.3d at 660.

Plaintiff has not put forward evidence that these factors weigh in its favor.  While it states that it began selling the product approximately five (5) years ago, it offers no evidence as to its advertising or sales volume.  Instead, Plaintiff makes cursory references to "selling out" of an unspecified number of units each year and being referenced in an undefined capacity in two (2) publications.  (Dkt. 5, Barnes Decl. at ¶ 9).  Plaintiff offers *no* evidence that its alleged trade dress is associated with the origin of its product in the minds of the purchasing public.

Further, while referencing its *pending* application for trademark protection of its royal blue and teal color scheme on the *Primary* Register, Plaintiff omits that the same trade dress is currently registered on the *Supplemental* register. *See* (Sar Decl. Ex. 10 at 9).  Placement on the Supplemental Register "indicates a preliminary determination that the mark is not distinctive of the applicant's goods." *National Nonwovens, Inc. v. Consumer Products Enterprises, Inc.*, 397 F. Supp. 2d 245, 247n.1 (D. Mass 2005); *Fashion Week, Inc. v. Council of Fashion Designers of America, Inc.*, 2016 WL 4367990, at *6 (S.D.N.Y. Aug. 12, 2016) (*citing* 3 McCarthy on Trademarks and Unfair Competition § 19:36 (4th ed.)) ("The 'very presence [of the mark] on the Supplemental Register indicates a preliminary determination that the mark is not distinctive of the applicant's goods.'").  Thus, contrary to Plaintiff's assertions, its very actions indicate that its color scheme has not acquired secondary meaning, as required to show success on the merits.

   c. <u>Plaintiff has not shown a likelihood of confusion exists.</u>

Plaintiff's failure to establish secondary meaning means that it "cannot establish a likelihood of confusion in a trade dress case." *See Campbell Sales Grp.,* 2010 WL 3945350, at *6.  However, even if Plaintiff could make such a showing, it has not shown a likelihood of confusion.  The Fourth Circuit considers a number of "non-dispositive, analytic factors to determine whether there is a likelihood of

confusion[,]" including: (1) strength of the plaintiff's mark; (2) similarity of the two marks; (3) similarity of the goods/services the marks identify; (4) similarity of the channels of trade the two parties use in their businesses; (5) similarity of advertising; (6) defendant's intent; and (7) actual confusion. *Worsham Sprinkler Co., Inc. v. Wes Worsham Fire Protection, LLC*, 419 F. Supp. 2d 861. 873 (E.D. Va. 2006) (*citing Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984)). The court need not weigh each factor equally, although actual confusion is "often paramount." *Giant Brands, Inc. v. Giant Eagle, Inc.*, F. Supp. 2d 646, 651-52 (D. Md. 2002) (internal citations omitted).

Here, because Plaintiff's alleged trade dress is almost purely functional, the only question to be addressed under the likelihood of confusion element is whether there is a likelihood of confusion arising as a result of the color schemes on both products. The evidence put forward by Plaintiff fails to show such a likelihood.

As to the strength of Plaintiff's mark, that factor weighs against Plaintiff. As discussed above, Plaintiff has not established secondary meaning, which is the "beginning" of the inquiry into a mark's strength. *See Worsham*, 419 F. Supp. 2d at 873 ("[T]o determine the strength of Plaintiff's marks, a court must look at where the mark falls on the conceptual spectrum and at its commercial strength"). Given lack of any evidence by Plaintiff that its royal blue and teal color combination has any commercial strength, this factor weighs in favor of BSL.

Even more importantly, there is no similarity between the two marks, as Plaintiff's own evidence makes clear:

 

BSL's product on the left, features an overwhelmingly Ensign Blue canopy with a horizontal Faded Denim Blue stripe on each side. The product name and logo feature prominently on the Faded Denim Blue stripes. By contrast, Plaintiff's purported trade dress consists of two vertical stripes, with "the color royal blue as applied to a first section" and "the color teal as applied to a second adjoining section of a canopy." (Sar Decl. Ex. 10 at 9). Simply stated, the color schemes of the two products look nothing alike. Plaintiff's attempts to claim that its "unique two-tone color scheme" somehow prohibits its competitors from using of any shade of blue should be rejected. Even setting aside the differing color schemes, the orientation of the stripes fully distinguishes the products from one another. In the same way that the orientation of the stripes of the German flag clearly delineate it from the flag of Belgium, so too does the orientation of the two products' canopies differentiate them from one another (although the product colors vary unlike the flags' colors):

    

**Flag of Germany**                    **Flag of Belgium**

This complete lack of similarity fundamentally underscore's Plaintiff's inability to establish evidence which supports an even more important element: a showing of actual confusion. Actual confusion "is the final and most important *Pizzeria Uno* factor used to determine likelihood of confusion." *Giant Brands*, 228 F. Supp. 2d at 654-55 (internal quotation omitted) ("This is so for the obvious reason that if there is evidence of substantial actual confusion or, on the other hand, evidence that there is no substantial actual confusion, such evidence will often by itself answer the question as to whether there is a 'likelihood of confusion,' between the two marks at issue.").

Here, although Plaintiff purports to have multiple pieces of evidence supporting "consumer confusion," even a cursory review of those materials reveals that they support the opposite conclusion. Each consumer review or email cited in Dane Barnes' Declarations fits into one of two categories: (1) comparisons between Plaintiff's and BSL products, (Dkts. 5-9, 5-10, 5-14, 15-2, 15-7, 15-8, 15-10); or (2) claims that the Beach Shade is a "knock-off" or "copycat" of Plaintiff's product, (Dkts.. 5-11, 5-12, 5-13, 15-3, 15-4, 15-5, 15-6, 15-11). Indeed, what each of these exhibits show is that consumers readily *distinguish* between the two products, not *confuse* them. *See* (Dkt. 15-7) ("The Beach Shade was not only less expensive (BTW, this is worth every penny!) but the material used was noticeably quieter than Shibumi.") Plaintiff has not pointed to a single example of a customer that has purchased a BSL Product under the mistaken belief that it was purchasing Plaintiff's product. Accordingly, Plaintiff has made no showing that it is likely to succeed on the merits of its trade dress claim.

The remaining factors likewise fail to move the needle in favor of Plaintiff. Plaintiff has put forward no evidence regarding its advertising efforts. The products are sold through different channels, with Plaintiff's selling their product through their website and select retail outlets and BSL selling its product through Amazon and its own website. Finally, while Plaintiff mischaracterizes Finneran's comments about Plaintiff's product in a self-serving attempt to impute intent to infringe where none exists, BSL has never intended to infringe Plaintiff's product, as evidenced by the clear differentiation between the products.

## C.     Plaintiff Has Not Shown Irreparable Harm.

It is well established that a movant cannot be granted a preliminary injunction "unless it establishes <u>both</u> of the first two factors, i.e., likelihood of success on the merits and irreparable harm." *Amazon.com, Inc. v. Barnesandnoble.com, Inc*., 239 F.3d 1343, 1350 (Fed. Cir. 2001); *Action NC v. Strach*, 216 F. Supp. 3d 597, 627 (M.D.N.C. 2016) (*citing Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346–47 (4th Cir. 2009)*, vacated on other grounds*, 559 U.S. 1089 (2010)). The movant must make "a clear showing that it is at risk of irreparable harm, which entails showing a likelihood of substantial and immediate irreparable injury." *Apple Inc. v. Samsung Elecs., Co., Ltd.*, 695 F.3d 1370,

1374 (Fed. Cir. 2012) ("Apple II") (internal quotation marks and citation omitted). To demonstrate irreparable harm, the movant must both (i) establish that it is subject to harm that cannot be adequately compensated though monetary damages, *see Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012), *and* (ii) demonstrate a causal nexus relating the alleged harm to the alleged infringement. *Apple, Inc. v. Samsung Elecs., Co., Ltd.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012) ("Apple I").

"Evidence of potential lost sales alone does not demonstrate irreparable harm" in a patent infringement case. *Edge-Works*, 285 F. Supp. 3d at 900. "The Federal Circuit has also rejected the argument that loss of the statutory right to exclude, in and of itself, is sufficient to support a finding of irreparable harm." *Pergo, Inc. v. Faus Grp., Inc.*, 401 F. Supp. 2d 515, 527 (E.D.N.C. 2005). For Lanham Act claims, irreparable harm is typically tied to whether the Plaintiff can establish the existence of trademark or trade dress infringement. *See Meineke Car Care Centers, Inc. v. Bica*, 2011 WL 4829420, at *3 (W.D.N.C. Oct. 12, 2011).

Plaintiff has failed to show that it will suffer any irreparable injury if this motion is denied. While the Motion mentions the possibility of lost sales, lost customers, and lost market share, it offers no competent evidence to show such harm. *See Nutrition 21 v. United States*, 930 F.2d 867, 871–72 (Fed. Cir. 1991) ("[N]either the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial."); *Edge-Works*, 285 F. Supp. 3d at 902 (explaining that while lost sales, lost customers, and lost market share are "the type of evidence relied upon by recent courts," "unsupported assertions regarding these types of evidence is [not] sufficient to find irreparable harm"). *See also Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). Indeed, given that Plaintiff has stated that it sells out of its product each year and cannot meet the demand of consumers, (Barnes Decl. at ¶ 9), it is hard to comprehend how Plaintiff would be harmed by a competitor making sales that Plaintiff acknowledges it would be otherwise unable to fulfill. Plaintiff has likewise failed to show that any of BSL's customers would have bought Plaintiff's product but for the BSL Product. Finally, despite the Court's apparent willingness during the June 21, 2021 Rule 16 scheduling conference to permit Plaintiff

to take discovery in connection with its Motion, Plaintiff has opted not to seek discovery and instead rely only upon its arguments and self-serving affidavits.

Moreover, Plaintiff has not offered sufficient evidence to show that Defendants' alleged infringement impacts Plaintiff's "goodwill and reputation with consumers, threatening a potential loss of customers and corresponding sales." (Dkt. 4 at 20). In *Edge-Works*, this Court denied a preliminary injunction based on parallel claims of irreparable harm. *Edge-Works*, 285 F. Supp. 3d at 900, 903. The plaintiff in *Edge-Works* alleged that the defendant's infringement would result in "harm to brand loyalty which causes unquantifiable lost sales, lost customers, and lost market share" and "harm caused by the erosion of brand distinction and reputation." *Id.* at 900. However, the plaintiff was unable to show the existence of brand loyalty through unfounded contentions about the plaintiff's actual and future sales through its president's affidavit. *Id.* Moreover, the Court found that although the plaintiff provided some evidence of harm to reputation through consumer comments to online articles, indicating confusion distinguishing the origination of the plaintiff's and defendant's products, it was not sufficient to show that "<u>irreparable</u> harm." *Id.*

Here, Plaintiff alleges a causal nexus between harm to its reputation and Defendants' infringement with unsupported allegations in the Barnes Declarations and customer comments. Like the affidavit in *Edge-Works*, Barnes's statements in his declaration are unsubstantiated and merely allege that "[c]ustomers have come to expect a certain quality of product and service when they buy a Shibumi Shade product" as evidence of Plaintiff's reputation and customer goodwill in the marketplace without more. (Barnes Decl. at ¶ 24). While Plaintiff does submit examples of customer comments comparing the Shibumi Shade and BSL Product, none actually show that customers are confused about the product's origins.[7] Based on the Declarations and customer comments alone, Plaintiff cannot show that it suffers and will suffer irreparable reputation harm. Plaintiff's unsupported assertions that its product is made with higher quality materials than BSL likewise fail to establish how *Plaintiff* would be harmed by such

---

[7] As discussed in Section III(B)(2)(c) above.

action, even if true. *See MicroAire Surgical Instruments, LLC v. Arthrex, Inc.*, 726 F. Supp. 2d 604, 640 ("It is difficult to imagine under what extraordinary set of circumstances the introduction of a product with a 'lower reputation for quality' would, instead of highlighting the higher quality of its competitors, reflect adversely upon the field as a whole.")

Ultimately, Plaintiff has not shown that the availability of monetary damages is not sufficient to make it whole. Where "the patentee can point to no specific interest that needs protection through interim equitable relief," *Pergo*, 401 F. Supp. at 529, Plaintiff cannot show irreparable harm.

**D.    The Balance of the Equities and Public Interest Weigh Against an Injunction.**

"The decision to grant or deny a preliminary injunction lies within the sound discretion of the district court." *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1323 (Fed. Cir. 2012). The court's sound discretion is to be exercised through a "balancing of the relative conveniences and inconveniences." *Rice & Adams Corp. v. Lathrop*, 278 U.S. 509, 514 (1929). Where a plaintiff fails to make the required showing of irreparable harm, "the balance of equities necessarily does not tip in his favor." *Maaco Franchising, LLC v. Ghirimoldi*, 2015 WL 4557382, at *7 (W.D.N.C. July 28, 2015). "The hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastating." *Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990).

When considering the public interest component, the focus "should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed. Cir. 1988). The "public benefits from the lower prices that result from free market competition." *Feit Electric Co., Inc. v. Cree, Inc.*, 2016 WL 1057039, at *9 (M.D.N.C. Mar. 14, 2016) (*citing Canon, Inc. v. GCC Intern. Ltd.*, 263 Fed. Appx. 57, 62 (Fed. Cir. Jan. 25, 2008). Where the moving party does not meet its burden of showing likelihood of success, the public interest is not served by granting a preliminary injunction. *Maaco*, 2015 WL 4557382 at *7.

Here, both factors weigh against a preliminary injunction. If forced to withdraw from the marketplace pending the outcome of this trial, BSL's ability to remain in business would be devastated, as

the product at issue is BSL's only product line. (Finneran Decl. at ¶¶ 8-9). BSL's reputation among its customers would be irreversibly maligned if it was required to cease selling its product before this Court can decide on the merits of the case. Further, given that Plaintiff has opted to bring suit against both BSL and its CEO, *in his individual capacity*, despite providing no evidence of individual liability beyond Finneran's role as the CEO and founder of BSL weighs strongly against such draconian measures being taken against Finneran and BSL in the early stages of this litigation.[8]

Additionally, the public interest would be harmed by forcing a lawful competitor to withdraw from the marketplace before ever having a chance to be heard on the merits. As made clear by the evidence submitted by Plaintiff, the public has an interest in seeing a lower-cost alternative product in the marketplace.

Taking into consideration that Plaintiff's likelihood of success on the merits is low, and that Plaintiff has not proven irreparable harm, the balance of the hardships and public interest tip in the favor of Defendants.

**E.      No Injunction Should Be Granted Without a Large Bond.**

While the injunction should be denied, given Plaintiff's failure to establish the required elements, in the event that this Court were to grant a preliminary injunction, a large bond should be required to offset the harm to BSL. "In fixing the amount of an injunction bond, the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *Hoechst Diafoil Co. v. Nan Ya Plastics, Inc.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). In setting the bond amount, courts must look to the gravity of the potential harm to the defendant. *Id.*

---

[8] Indeed, Plaintiff's entire basis for bringing suit against Mr. Finneran appears to be premised on the fact that Mr. Finneran allegedly stated that he would not be personally liable for any judgment entered against BSL. Aside from this accurate statement of law, Plaintiff has offered no evidence that Mr. Finneran has personally engaged in any conduct separate from BSL, that BSL and Mr. Finneran are alter-egos and/or are disregarding the corporate form, or any other action that could remotely constitute a basis for individual liability.

> [T]he judge usually will fix security in an amount that covers the potential
> incidental and consequential costs as well as either the losses the unjustly
> enjoined or restrained party will suffer during the period the party is prohibited
> from engaging in certain activities or the complainant's unjust enrichment caused
> by his adversary being improperly enjoined or restrained.

Charles Alan Wright et al., Federal Practice & Procedure § 2954, at 325 (3d ed. 2013). BSL projected that it would generate revenues in excess of one million dollars this year alone from selling the BSL Product. (Finneran Decl. at ¶ 11). Given that the BSL Product is BSL's sole product offering at this time, being prohibited from selling its product through the duration of this matter would likely cripple BSL's ability to maintain its business operations. (*Id.* at ¶ 9). Accordingly, BSL requests that, in the event that this Court were to grant a preliminary injunction, it would set a bond large enough to offset the substantial harm that would come to BSL.

<h2 style="text-align:center">IV. CONCLUSION</h2>

For the foregoing reasons, Defendants respectfully request that the Court deny all of the pre-trial injunctive relief requested by Plaintiff in the Motion.

This the 14th day of July, 2021.

<div style="margin-left:50%">

*/s/ Alan B. Felts*
Jeffrey S. Southerland
NC State Bar No. 34221
Email: jsoutherland@tuggleduggins.com
Alan B. Felts
NC State Bar No. 42826
Email: afelts@tuggleduggins.com
TUGGLE DUGGINS P.A.
P.O. Box 2888
Greensboro, NC 27402
Tel: 336-378-1431


David W. Sar
N.C. State Bar No. 23533
Email: dsar@brookspierce.com
BROOKS, PIERCE, MCLENDON,
HUMPHREY & LEONARD, LLP
Post Office Box 26000
Greensboro, NC 27420-6000
Telephone: 336-271-3175
Facsimile: 336-232-9075
*Attorneys for Defendants*

</div>

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was this date electronically filed and served on all parties to this action through the Court's CM/ECF system.

This the 14th day of July, 2021.

/s/ Alan B. Felts
Alan B. Felts
NC State Bar No. 42826
*Attorney for Defendants*

OF COUNSEL:

TUGGLE DUGGINS P.A.
P.O. Box 2888
Greensboro, NC 27402
Telephone:  (336) 378-1431
Facsimile:  (336) 274-6590