IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:21-CV-256-FL

|  |  |  |
|---|---|---|
| SHIBUMI SHADE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| BEACH SHADE LLC, and MATTHEW | ) | |
| FINNERAN, | ) | |
| | ) | |
| Defendants. | ) | |

This matter comes before the court on plaintiff's motion for temporary restraining order (DE 3), which the court construes as one for preliminary injunction, as well as defendants' motion to strike second supplemental declaration of Dane Barnes, in support of plaintiff's reply (DE 35). The court convened hearing on plaintiff's request for injunctive relief August 6, 2021. For the following reasons, plaintiff's motion is granted in part as set forth herein, and defendants' motion is denied as moot.

## STATEMENT OF THE CASE

Plaintiff commenced this action June 11, 2021, asserting that defendants Beach Shade LLC ("Beach Shade") and Matthew Finneran ("Finneran") have infringed and continue to infringe plaintiff's patents, U.S. Patent Nos. 10,753,117 ("'117 Patent") and 10,190,330 ("'330 Patent"), which apply to plaintiff's beach shade product, known as the "Shibumi Shade." Plaintiff also asserts that defendants have infringed on its trade dress and that defendants have engaged in unfair and deceptive trade practices, in violation of section 75-1.1 of the General Statutes of North

Carolina. Plaintiff seeks declaratory and injunctive relief together with compensatory and treble damages, and its attorneys' fees. Specifically, plaintiff seeks to enjoin defendants from:

1. Continuing infringement of the claims of the '330 and '117 Patents;

2. Continuing infringement of Shibumi Shade's trade dress; and

3. Continuing manufacture, importation, use, sale, and offers to sell the Accused Products, including but not limited to the "Beach Shade" products, whether in person, through its website, social media, third-party online retailers including Amazon and Shopify, or brick-and-mortar retail stores.

(Pl's Mot. (DE 3) at 1).

Plaintiff initially relied upon declaration of Dane Barnes ("Barnes"), a co-founder of plaintiff, referencing 1) copies of webpages related to the Beach Shade product; 2) correspondence between the parties; and 3) comments and correspondence from customers regarding the parties' products. Subsequently, plaintiff filed Barnes's supplemental declaration referencing additional copies of webpages and correspondence from customers.

With consent of the parties, the court set hearing on plaintiff's motion for August 6, 2021, established a related briefing schedule, and memorialized defendants' agreement to "not engage in the sale and marketing of the accused 'Beach Shade' products within the United States through any medium, including in person, through the www.beachshade.com website, social media, third-party online retailers including Amazon and Shopify, or brick-and-mortar retail stores," pending resolution of the instant motion. (June 29, 2021, Order (DE 18) at 1-2). The court also directed the parties to file a joint claim construction statement, as described in Local Patent Rule 304.3, to aid the court in tentative claim construction necessary to resolve plaintiff's motion and to coordinate briefing on the issue.

In their defense, defendants rely upon the sworn testimony of defendant Finneran, supported by a document providing instructions on the set-up of defendant Beach Shade's product.

Reliance also is placed upon the sworn testimony of its counsel, David W. Sar, referencing: 1) certain prior art of the patents-in-suit cited during their prosecution; 2) copies of the patent file history or "file wrapper" for each patent-in-suit; 3) dictionary excerpts; and 4) the file wrapper and status page of a trademark on the Supplemental Register, Registration No. 6,009,936.

What has been called in the litigation the second supplemental or third declaration of Barnes followed into the record as a part of plaintiff's reply, which defendants seek to strike, including 1) additional correspondence and comments from customers; 2) declarations by customers and retailers; 3) news articles about the Shibumi Shade; and 4) correspondence from companies involved in the manufacture of the Shibumi Shade.

## STATEMENT OF FACTS

The court finds the following facts pertinent to the instant motion for injunctive relief, without regard to the second supplemental declaration of Barnes together with that documentary evidence upon which it relies.[1]

Plaintiff is a North Carolina-based corporation, founded in 2016 by Dane Barnes, Scott Barnes, and Alex Slater, which manufactures and sells the Shibumi Shade. (See Barnes First Decl. (DE 5) ¶¶ 1-3).[2] The Shibumi Shade is the subject of plaintiff's '117 Patent and '330 Patent, which describe "a system for providing shade onto a surface." ('117 Patent (DE 1-9) at 2; '330 Patent (DE 1-7) at 2). Plaintiff has garnered media and market attention for its product. (See Barnes First

---

[1]     Accordingly, defendants' motion (DE 35) is denied as moot.

[2]     The court draws its findings of fact, in part, from testimony of Barnes proffered at the August 6, 2021, motion hearing, for which specific citation is not provided where the testimony is subject only of the court reporter's rough notes but not a transcript.

3

Decl. (DE 5) ¶¶ 4, 9). Plaintiff's product is pictured below:



(Compl. (DE 1) ¶ 16).

Defendant Beach Shade is a North Carolina limited liability company engaged in the business of selling the accused beach shade product known as "the Beach Shade." (Answer (DE 33) ¶ 2;[3] Finneran Decl. (DE 23) ¶¶ 4-6). Defendant Finneran is a resident of North Carolina and the chief executive officer of defendant Beach Shade. (Answer (DE 33) ¶ 3; Finneran Decl. (DE 23) ¶ 3). Defendant Beach Shade's product is pictured below on the left, for side-by-side comparison with plaintiff's Shibumi Shade, on the right:

 

---

[3]     In those instances in which an allegation in the complaint is admitted in the answer, the court cites only to the paragraph in the answer for that admission.

(Compl. (DE 1) ¶ 19).

The products consist, in effect, of a frame, a canopy attached thereto, and a carrying case used as an anchor by connecting a cable from said anchor to the frame. The products differ in their canopy designs. They also differ in that the Shibumi Shade's frame pieces are all connected by a single "shock" or "tension" cord, while the Beach Shade's frame consists of two discrete lengths of pole sections comprising the frame, each with their own "shock" or "tension" cord running through them, that must be connected by a black plastic connector piece. (See Finneran Decl. (DE 23) ¶ 23). Finally, they differ in that the Shibumi Shade anchor string must be tied to the carrying case, while the Beach Shade anchor string may be connected to the carrying case by a carabiner clip.

The instant dispute between the parties arose upon plaintiff becoming aware of defendants and, subsequently, the sale of the Beach Shade on defendant Beach Shade's website and, shortly after, third-party retailer Amazon's website. (Answer (DE 33) ¶ 23; Barnes First Decl. (DE 5) ¶¶ 11, 17; Finneran Decl. (DE 23) ¶ 10). Despite communications between the parties, (see Barnes First Decl. (DE 5) ¶¶ 13-14; Finneran Decl. (DE 23) ¶¶15-16), they could not resolve their disagreement and the instant litigation followed. Additional, pertinent facts will be set forth in the court's analysis below.

## COURT'S DISCUSSION

A.      Standard of Review

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). A preliminary injunction is "an

5

extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Id. at 22.

In an order granting or denying a preliminary injunction, the court must set forth findings of fact and conclusions of law bearing on the court's decision. Fed. R. Civ. P. 52(a)(2); see Ciena Corp. v. Jarrard, 203 F.3d 312, 321 (4th Cir. 2000). With respect to these findings of fact and conclusions of law, a preliminary injunction is decided "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981). "A party thus is not required to prove his case in full at a preliminary-injunction hearing," and the findings of fact and conclusions of law made by a court in ruling on a preliminary injunction are not binding at trial on the merits. See id.; see also Jack Guttman, Inc. v. Kopykake Enterprises, Inc., 302 F.3d 1352, 1361 (Fed. Cir. 2002) (explaining that a district court may "issue only a tentative claim construction and . . . base its resolution of a preliminary injunction motion upon that tentative claim construction").

B.    Analysis

1.    Likelihood of Success on the Merits

Plaintiff argues that it has demonstrated it is likely to succeed on the merits of its patent infringement claims as a basis for preliminary injunctive relief. For the reasons described below, the court agrees. Because the court herein grants plaintiff's motion for injunctive relief on the basis of its patent infringement claims, the court does not consider whether plaintiff has demonstrated a right to injunctive relief as to its claim of trade dress infringement. See, e.g., Roe v. Dep't of Def., 947 F.3d 207, 224 (4th Cir. 2020) (citing League of Women Voters v. North Carolina, 769 F.3d 224, 237-38 (4th Cir. 2014)); McNeil-PPC, Inc. v. Granutec, Inc., 919 F. Supp. 198, 201 (E.D.N.C. 1995) ("Where multiple causes of action are alleged, plaintiff need only show

likelihood of success on one claim to justify injunctive relief.").

> With respect to a claim for patent infringement —
>
> In order to demonstrate a likelihood of success on the merits, [plaintiff] must show that, in light of the presumptions and burdens that will inhere at trial on the merits, (1) [plaintiff] will likely prove that [defendant] infringes the [relevant] patent, and (2) [plaintiff's] infringement claim will likely withstand [defendant's] challenges to the validity and enforceability of the [relevant] patent.

Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001); see also Murata Mach. USA v. Daifuku Co., 830 F.3d 1357, 1363 (Fed. Cir. 2016) (explaining that the law of the regional circuit controls "general preliminary injunction considerations" but that United States Court of Appeals for the Federal Circuit precedent controls preliminary injunction "considerations specific to patent issues").  Defendants do not raise any validity or enforceability challenges at this time.  (Defs. Resp. (DE 22) at 12 n.6).  Accordingly, the court only considers whether plaintiff has shown likelihood of infringement of the '330 and '117 Patents.

Analysis of infringement involves two steps.  "The first step is determining the meaning and scope of the patent claims asserted to be infringed."  Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd 517 U.S. 370 (1996); see also Chamberlain Grp., Inc. v. Lear Corp., 516 F.3d 1331, 1340 (Fed. Cir. 2008) ("[A] correct claim construction is almost always a prerequisite for imposition of a preliminary injunction.").  "The second step is comparing the properly construed claims to the device accused of infringing."  Markman, 52 F.3d at 976.

### a.    Claim Construction

The first step of patent infringement analysis is "commonly known as claim construction or interpretation."  Id.  The court's role in claim construction is to "analyze the text of the patent and its associated public record and apply the established rules of construction, and in that way arrive at the true and consistent scope of the patent owner's rights to be given legal effect."  Id. at 979.  "It is a bedrock principle of patent law that the claims of a patent define the invention to

which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).[4] Thus, the goal of claim construction is to determine the meaning of the claims. See id.; see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute.").

"[T]he words of a claim are generally given their ordinary and customary meaning." Phillips, 415 F.3d at 1312. In turn, "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Id. at 1313. In addition, the claims "must be read in view of the specification, of which they are a part." Id. at 1315. "[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." Id. "[A]lthough the specification often describes very specific embodiments of the invention, [the Federal Circuit has] repeatedly warned against confining the claims to those embodiments." Id. at 1323. "Much of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." Id.

The prosecution history also may be relevant. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). "The prosecution history . . . consists of the complete record of the proceedings before the [Patent and Trademark Office] and includes the prior art cited during the examination of the patent. Like the specification, the prosecution history provides evidence of how the [Patent and Trademark Office] and the inventor understood the patent." Phillips, 415 F.3d

---

[4] Throughout this order, internal citations and quotation marks are omitted from citations unless otherwise specified.

at 1317.  However, the court cannot "rely on the prosecution history to construe the meaning of the claim to be narrower than it would otherwise be unless a patentee limited or surrendered claim scope through a clear and unmistakable disavowal."  3M Innovative Props. v. Tradegar Corp., 725 F.3d 1315, 1322 (Fed. Cir. 2013).

In this case, the relevant claims are as follows.  Claim 1 of the '330 Patent recites:

1. A system for providing shade onto a surface, comprising:

a canopy configured for engagement with, and complete aerial suspension by, a single, continuous frame,

> wherein the frame consists essentially of a plurality of sections configured for end-to-end alignment from a left end to a right end, wherein each section is configured to engage with adjacent sections,

> wherein the left end and right end are configured to be secured to the surface for aerially supporting the frame and completely suspending the canopy aerially, and

a container for housing and transporting all of the other components of the system, wherein the container is also an anchor for housing weight,

a cord selectively engaged or coupled to an interior of the container for inverting the container to serve as the anchor for housing weight, the cord selective engageable or coupled to the frame.

('330 Patent (DE 1-7) col. 7, l. 66–col. 8, l. 16 (emphases added)).  Claim 1 of the '117 Patent recites:

1. A system for providing shade onto a surface, the system comprising:

a frame being directly engageable with the surface such that when the frame is directly engaged with the surface, the frame is configured to lie  within a plane substantially perpendicular to the surface, wherein the frame comprises a plurality of longitudinally-extending sections arrangeable so that a first longitudinally-extending section and a second longitudinally-extending section are each directly engaged with the surface at first ends thereof and are coupleable to one another about opposing, second ends or are coupleable to one another about opposing, second ends or are each respectively coupleable to first and second ends of at least one intermediate longitudinally-extending section arranged therebetween;

a cable extending through the plurality of longitudinally-extending sections of the frame from the first end of the first longitudinally-extending section to the first end of the second longitudinally-extending section and any of the at least one intermediate longitudinally-extending sections arranged therebetween so that when

the first end of the first longitudinally-extending section and the first end of the second-longitudinally extending section are directly engaged with the surface, the cable is configured to lie within the plane substantially perpendicular to the surface . . . .

('117 Patent (DE 1-9) col. 7, l. 66–col. 8, l. 24 (emphasis added)).

The court turns first to construction of the terms disputed by the parties.

i.    Disputed Term – "Single"

- Plaintiff's proposed construction: no construction necessary/plain and ordinary meaning

- Defendants' proposed construction: consisting of or having only one undivided part as contrasted with double or many

- Court's construction: no construction necessary

The term "single" appears in, as pertinent here, claim 1 of the '330 Patent, which provides for "a canopy configured for engagement with, and complete aerial suspension by, a single, continuous frame." ('330 Patent (DE 1-7) col. 8, ll. 1-2).  To construe "single," here, to mean "consisting of or having only one undivided part as contrasted with double or many" would be to import limitations onto the unambiguous claim language and would go beyond claim construction's purpose of "simply . . . elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims."  Terlep v. Brinkmann Corp., 418 F.3d 1379, 1382 (Fed. Cir. 2005).

First, the term at issue, single, is one with a general meaning and is "used in common parlance."  Summit 6, LLC v. Samsung Elecs. Co., 802 F.3d 1283, 1291 (Fed. Cir. 2015).  The "district court is not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims."  O2 Micro, 521 F.3d at 1360.  In such cases, where "the ordinary meaning of claim language . . . may be

10

readily apparent even to lay judges," "claim construction . . . involves little more than the application of the widely accepted meaning of commonly understood words." Phillips, 415 F.3d at 1314. "Because the plain and ordinary meaning of the disputed claim language is clear" in this context, the court declines to provide an additional, potentially redundant and confusing, construction of the term single, Summit 6, 802 F.3d at 1291, and one which, in fact, would not resolve the parties' dispute. Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.").

Further, defendant's proffered definition is at odds with the claim language. The language of the claim itself in describing a single, continuous frame claims that it is comprised of a "plurality of sections configured for end-to-end alignment." ('330 Patent (DE 1-7) col. 8, ll. 3-4). This is in tension with the proposed construction "consisting of or having only one undivided part as contrasted with double or many." (Joint Claim Construction Stmt. (DE 26-1) at 1 (emphases added)). To the extent defendants' construction draws on the pictures and preferred embodiments of the invention described in the specification, "[s]uch a construction would improperly add a limitation appearing in the specification and the drawings, but not appearing in the unambiguous language of the claim." Gart v. Logitech, Inc., 254 F.3d 1334, 1343 (Fed. Cir. 2001).

Defendants' proposed construction of "single" lacks support in the patent and must therefore be rejected. Here, the instant claim construction dispute is not "a fundamental dispute regarding the scope of a claim term," as would merit construction of the term. Eon Corp. IP Holdings v. Silver Spring Networks, 815 F.3d 1314, 1318 (Fed. Cir. 2016). Rather, this appears instead to be an instance where the real issue in dispute is this term's application to accused product, which is not a question of construing the patent's claims. See Biotec Biologische

Naturverpackungen GmbH & Co. KG v. Biocorp, Inc., 249 F.3d 1341, 1349 (Fed. Cir. 2001) ("Despite th[e parties'] debate, the meaning of 'melting' does not appear to have required 'construction,' or to depart from its ordinary meaning. The issue in dispute was the application of the melting step in the accused process, a factual question of infringement.").

Defendants argue, in relation to both their claim construction arguments and, as detailed below, their arguments against application of the doctrine of equivalents, that plaintiff, through history of the patents' prosecution, has disclaimed certain meanings of terms and is estopped from recapturing certain equivalents to the claims of the patents. (See, e.g., Defs.' Resp. (DE 22) at 20; Defs.' Claim Construction Br. (DE 30) at 4). Although the two doctrines are related and can be "engender[ed]" by "a single action" by a patentee, the court addresses such only in relation to the doctrine of equivalents, below. Trading Techs. Int'l, Inc. v. Open E Cry, LLC, 728 F.3d 1309, 1322 (Fed. Cir. 2013). Defendants' argument sounds more in the "infringement analysis to prevent a patentee from using the doctrine of equivalents to recapture subject matter surrendered from the literal scope of a claim during prosecution" than as "affects claim construction and applies where an applicant's actions during prosecution prospectively narrow the literal scope of an otherwise more expansive claim limitation." Id.

Moreover, it is far from clear that any action by plaintiff resulted in a "clear and unmistakable" disclaimer. Omega Eng'g, Inc, v. Raytek Corp., 334 F.3d 1314, 1326 (Fed. Cir. 2003); see also Avid Tech., Inc. v. Harmonic, Inc., 812 F.3d 1040, 1045 (Fed. Cir. 2016) ("Where the alleged disavowal is ambiguous, or even amenable to multiple reasonable interpretations, we have declined to find prosecution disclaimer."). "This case does not present an instance where an inventor distinguishes an invention over the prior art in an unmistakable disavowal of those prior art features." Epistar Corp. v. Int'l Trade Comm'n, 566 F.3d 1321, 1336 (Fed. Cir. 2009). Finally,

while "explanation presented by the inventor during patent examination is relevant to claim construction," MasterMine Software, Inc. v. Microsoft Corp., 874 F.3d 1307, 1312 (Fed. Cir. 2017), the amendments to the patents discussed by defendants fail to edify the meaning of "single" in light of the unambiguous claim language.

In sum, the court will not construe single beyond holding that its ordinary meaning controls.

ii.     Disputed Term – "Continuous Frame"

- Plaintiff's proposed construction: no construction necessary/plain and ordinary meaning

- Defendants' proposed construction: uninterrupted frame (the archway formed from one beach/surface touching end to the other beach/surface touching end)

- Court's construction: no construction necessary

The next term, "continuous frame," follows immediately after the previous term "single" in claim 1 of the '330 Patent. However, the parties' dispute, again, is less over the meaning of "continuous" as used in the '330 Patent and more as to whether the Beach Shade's use of two frames pieces is a continuous frame. (See, e.g., Pl.'s Claim Construction Br. (DE 31) at 4; Defs.' Resp. (DE 22) at 20 ("Thus, there is one single frame, not two frames."); Defs.' Claim Construction Br. (DE 30) at 5). Accordingly, because the parties do not "present a fundamental dispute regarding the scope of a claim term" and rather dispute the proper application of a claim term to an accused product, the court does not construe "continuous frame" beyond its ordinary meaning, leaving the later question to its proper place in the infringement inquiry. See O2 Micro, 521 F.3d at 1362.

13

iii.     Disputed Term – "Interior"

- Plaintiff's proposed construction: no construction necessary/plain and ordinary meaning

- Defendant's proposed construction: the internal portion or inside of something

- Court's construction: no construction necessary

The term "interior," as the previous terms, appears in claim 1 of the '330 patent, in its description of "a cord selectively engaged or coupled to an interior of the container for inverting the container to serve as the anchor for housing weight, the cord selective engageable or coupled to the frame." ('330 Patent (DE 1-7) col. 8, ll. 15-18). While the parties dispute whether "interior" requires further construction by the court, the heart of their dispute goes to whether the Beach Shade's carrying bag's attachment point to the frame is considered the interior, a "question[] that do[es] not go to claim scope, but instead go[es] to infringement." Eon Corp., 815 F.3d at 1319. Further, defendants' proposed construction for the term does not "elaborate[e] the . . . terse claim language in order to understand and explain, but not to change, the scope of the claim[]," see Terlep, 418 F.3d at 1382, and, instead, redundantly redescribes the same term.

iv.     Disputed Term – "Extending Through"

- Plaintiff's proposed construction: no construction necessary/plain and ordinary meaning

- Defendant's proposed construction: stretching forth from one end or side to the other

- Court's construction: no construction necessary

Unlike the other terms at issue, "extending through" appears in the '117 Patent, in its claim 1, which claims

14

> [a] system for providing shade onto a surface, . . . comprising . . . a cable <u>extending</u> <u>through</u> the plurality of longitudinally-extending sections of the frame from the first end of the first longitudinally-extending section to the first end of the second longitudinally-extending section and any of the at least one intermediate longitudinally-extending sections arranged therebetween so that when the first end of the first longitudinally-extending section and the first end of the second-longitudinally extending section are directly engaged with the surface, the cable is configured to lie within the plane substantially perpendicular to the surface . . . .

('117 Patent (DE 1-9) col. 8, ll. 14-24). Defendants' proposed construction is not needed to adequately understand the claim language and it fails to elaborate in a helpful manner in order to explain the scope of the related claim. "Extending through" does not "ha[ve] more than one 'ordinary' meaning" and "reliance on [the] term's 'ordinary' meaning" will "resolve the parties' dispute," when applied in the infringement analysis, where the parties' true disagreement lies. <u>See</u> <u>O2 Micro</u>, 521 F.3d at 1361.

With the patents' claims construed to the degree necessary, the court turns next to comparing the properly construed claims to the device accused of infringing.

       b.    Infringement

An accused device may infringe literally or under the doctrine of equivalents. <u>See, e.g.</u>, <u>Zelinski v. Brunswick Corp.</u>, 185 F.3d 1311, 1316 (Fed. Cir. 1999) ("The second step of an infringement analysis requires that the patentee prove that the accused device embodies every limitation in the claim, either literally, or by a substantial equivalent."). Although plaintiff has not shown a likelihood of success on the merits under a literal infringement theory,[5] the court concludes that plaintiff has shown it would likely succeed on the merits on a theory of equivalents.

---

[5] "To prove literal infringement, the patentee must show that the accused device contains <u>each and every</u> <u>limitation</u> of the asserted claims." <u>Ericsson, Inc. v. D-Link Sys., Inc.</u>, 773 F.3d 1201, 1215 (Fed. Cir. 2014). Here, plaintiff has not shown that the Beach Shade: 1) has "a cord selectively engaged or coupled to an interior of the container for inverting the container to serve as the anchor for housing weight," ('330 Patent (DE 1-7) col. 8, ll. 15-17), where all indication is that the accused product's cord connection point is on the exterior of the bag, and 2) that it has "<u>a cable</u> extending through the plurality of longitudinally-extending sections of the frame," ('117 Patent (DE 1-9) col. 8, ll. 14-15 (emphasis added)), where the accused product relies on <u>two</u> cables running the length of each individual section of the two frame poles.

"Under the doctrine of equivalents, 'a product or process that does not literally infringe . . . the express terms of a patent claim may nonetheless be found to infringe if there is "equivalence" between the elements of the accused product or process and the claimed elements of the patented invention.'" Unidynamics Corp. v. Automatic Prod. Int'l, Ltd., 157 F.3d 1311, 1322 (Fed. Cir. 1998) (quoting Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17 (1997)), abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665 (Fed. Cir. 2008).

There are two formulations of the test for equivalence. "[T]he accused and claimed elements are equivalent" 1) "if there are only insubstantial differences between them" or 2) if the "substitute element matches the function, way, and result of the claimed element." Pac. Coast Marine Windshields Ltd. v. Malibu Boats, LLC, 739 F.3d 694, 700 (Fed. Cir. 2014); see also Warner-Jenkinson, 520 U.S. at 29 ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole."). Which test is more helpful will depend on the facts of the case and specifics of the accused device, but "the essential inquiry" is unchanged. See Warner-Jenkinson, 520 U.S. at 40.

The court finds the function-way-result inquiry to be the proper lens for the equivalence analysis. Under that test, an accused element is equivalent to a claim limitation "if it performs substantially the same function in substantially the same way to obtain the same result." Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608 (1950); Duncan Parking Techs., Inc. v. IPS Grp., Inc., 914 F.3d 1347, 1362 (Fed. Cir. 2019). Here, despite defendants' assertions to the contrary, the Beach Shade's accused elements are the equivalent to the patents-in-suits' limitations because they perform substantially the same function in substantially the same way to obtain the same result. Although "equivalence [must] be assessed on a limitation-by-limitation

16

basis, as opposed to from the perspective of the invention as a whole," Freedman Seating Co. v. Am. Seating Co., 420 F.3d 1350, 1358 (Fed. Cir. 2005), the court's analysis focuses on those element-limitation relationships in dispute.

        i.        Cord Connecting to Interior of Container

First, connecting the frame to the exterior of the carrying bag by string, rope, or cord performs substantially the same function as the '330 Patent's selectively engaging or a coupling a cord to the interior of the container (securing the frame to an anchor) and is done in substantially the same way (connection by string to single point on the frame to a single point on the bag). (See also '330 Patent (DE 1-7) col. 6, ll. 50-56 (explaining that in some embodiments of the claimed invention "the cord may be . . . coupled to the bottom of the container for permitting full inversion," "at a mid-point of the container for permitting half inversion," or even "coupled with an exterior of the container")). See generally Genentech, Inc. v. Wellcome Found. Ltd., 29 F.3d 1555, 1567 (Fed. Cir. 1994) ("The operative definition for purposes of equivalency analysis is the intended function as seen in the context of the patent, the prosecution history, and the prior art.").

In either instance, the connection allows the carrying case, once filled with weight, to serve as an anchor, mooring the frame and allowing the canopy to be suspended by the wind, achieving substantially the same result.[6] (Compare Finneran Decl. ¶¶ 29 (describing circumstances in which the Beach Shade's bag "would not be functional as an anchor[,] . . . which might make the product incapable of functioning on especially wind days), 31 ("[T]he bag . . . can be utilized as an anchor by filling it with sand [as] necessary for the [Beach Shade] to stand upright and function as described."), with '330 Patent (DE 1-7) col. 8, ll. 15-17 (describing "a cord selectively engaged

---

[6]      Although defendants, at times, describe two "windless poles" that the Beach Shade product includes that can be used "to stake down the rear of the canopy on days without adequate wind," (see, e.g., Finneran Decl. (DE 23) ¶ 32), defendants have not contended that the windless poles alter the infringement analysis.

. . . to an interior of the container for inverting the container to serve as an anchor for housing weight"); id. col. 6, ll. 17-21 ("[T]he system may further include a cord engaged with, or coupled to, an anchor, the canopy, and/or the frame for providing support to the frame . . . . The anchor may be configured for housing weight.")).

Defendants argue that the interior connection is essential to "achieve [p]laintiff's stated function[] of minimizing sand in the bag during housing and transportation." (Defs.' Resp. (DE 22) at 22). The '330 Patent does, in more verbose terms, explain that "[i]n some embodiments, the container may be inverted for housing weight for ensuring that minimal amounts of weight remain in the container once re-inverted so that the contents of the system are not disturbed by any weight during transportation and/or storage of the system." ('330 Patent (DE 1-7) col. 6, ll. 43-48). While the Beach Shade lacks this utility, in that the external connection point negates any need to invert the bag, meaning that sand placed inside as weight may linger, "[e]quivalence . . . 'does not require complete identity for every purpose and in every respect.'" Nestier Corp. v. Menasha Corp.-Lewisystems Div., 739 F.2d 1576, 1579 (Fed. Cir. 1984) (quoting Graver Tank, 339 U.S. at 609). The accused product's element of an external connection point on the anchor performs substantially, not completely, the same function as the '330 Patent's limitation of a cord selectively engaged to an interior of the container for inverting the container to serve as the anchor for housing weight. See also Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp., 149 F.3d 1309, 1317 (Fed. Cir. 1998) ("[A]ny analysis of infringement under the doctrine of equivalents necessarily deals with subject matter that is 'beyond,' 'ignored' by, and not included in the literal scope of a claim.").

       ii.     A Single, Continuous Frame Consisting of a Plurality of Sections

Next, the Beach Shade's two-pole frame system is the equivalent of the '330 Patent's limitation of "a single, continuous frame . . . consist[ing] of a plurality of sections." ('330 Patent

18

(DE 1-7) col. 8, ll. 2-3).  First, inserting two poles into a connector to create a frame performs substantially the same function as setting up a single, continuous frame, in this context.  See Ethicon Endo-Surgery, 149 F.3d at 1320 ("[T]wo physical components of an accused device may be viewed in combination to serve as an equivalent of one element of a claimed invention.").  Both function as a structure with which the canopy engages and which elevates and aerially suspends that canopy to provide shade.  The result of both systems is a frame perpendicular to the surface with its ends terminating in the surface supporting the frame.  And the way this is achieved is substantially the same in that the '330 Patent's limitation imagines a plurality of sections of a frame connected end-to-end to achieve the result of the final frame shape while the Beach Shade relies upon two frame poles, comprising a plurality of male end to female end connecting pieces, that ultimately connect in the middle by a separate connector piece.  (See also '330 Patent (DE 1-7) col. 5, ll. 11-14 ("When two or more or all of the sections are aligned end-to-end and engaged with adjacent sections, the frame may be positioned to receive and support the canopy."); Finneran Decl. (DE 23) ¶21 ("[T]he [Beach Shade] has two identical support poles generally forming the left and right portions of the arch.")).

Defendants argue that the Beach Shade fails to achieve the '330 Patent's single, continuous frame's function "of having fewer parts and steps required during setup." (Defs.' Resp. (DE 22) at 22-23).  The '330 Patent's background section explains that "[s]hading systems of the prior art . . . are cumbersome to transport or assemble, due to the number of parts involved, [and] steps required during setup." ('330 Patent (DE 1-7) col. 1, ll. 24-29).  This is but one purpose of the '330 Patent's single, continuous frame.  See Nestier Corp., 739 F.2d at 1579.  Moreover, the Beach Shade's two-pole-and-connector system does not so significantly alter the number of parts and steps involved to defeat substantially the '330 Patent's limitation's purpose, especially in light of the prior art

imagined by the '330 Patent that includes five poles, "a magnetic hold bar," and "two optional footings." (See '330 Patent (DE 1-7) at 3 (citing Sotirkys, U.S. Patent No. 7,789,097 (DE 24-4) (filed Sept. 7, 2010) (hereinafter "Sotirkys" or "Sotirkys Patent")); Sotirkys Patent (DE 24-4) at 3; id., col. 2, ll. 24-29). In whole, the Beach Shade's frame element performs substantially the same function, in substantially the same way, and produces the same result as the '330 Patent's single, continuous frame limitation.

iii.    A Cable Extending Through a Plurality of Sections

Similarly, the two-cable system of the Beach Shade is the equivalent of the '117 Patent's limitation of "a cable extending through the plurality of longitudinally-extending sections of the frame from" one end to another. ('117 Patent (DE 1-9) col. 8, ll. 15-24). The two shock cords running through the two pole sections of the Beach Shade frame perform substantially the same function as the '117 Patent's single cable extending through the sections of the frame. Each system is aimed at providing supporting tension to the end-to-end aligned frame sections of the deployed sunshade. (See Finneran Decl. (DE 23) ¶ 31 ("The two poles with their separate shock cords . . . are necessary for the [Beach Shade] to stand upright and function as described."); '117 Patent (DE 1-9) col. 5, ll. 43-46 (describing the internal cable as "providing supporting tension to the end-to-end alignment of the supporting configuration")). Further, the cables through each also serve to keep the plurality of pole sections connected to one another. ('117 Patent (DE 1-9) col. 5, ll. 40-43; see Finneran Decl. (DE 23) ¶ 23 ("[T]wo shock cords (one per pole) run through the respective support poles in order to connect each pole's internal sections.")).

While defendants represented at hearing that the two-cable system provides no structural support to the arch and that instead support was provided by the connector piece, like a Roman keystone, this does not forestall the court's conclusion that the two-cable system provides the same

20

tension-providing function, at least to each individual pole section. (See '117 Patent Prosecution History (DE 24-7) at 120-23 (referencing a "Seo" patent, U.S. Patent No. 2003/0089390, as relevant prior art)); U.S. Patent. No. 2003/0089390 A1, at [18] (filed May 15, 2003) ("[O]wing to the flexibility of the connecting string, each of the poles (each consisting of a plurality of the unit rods) can be assembled into an arch shaped pole.")). See generally Anderson v. Kimberly-Clark Corp., 570 F. App'x 927, 932 n.3 (Fed. Cir. 2014) ("It is also well-established that a court may take judicial notice of patents or patent applications."). The "two [] inches of air gap inside the connector," (Finneran Decl. (DE 23) ¶ 24), does not alter this conclusion.

The cord system imagined in the '117 Patent's limitation and the two-cable system present in the Beach Shade work in substantially the same way to produce the same result. In each case, a cable extends through a plurality of longitudinally extending sections of the frame, from one end to another, with the Beach Shade relying on, in a substantially similar way, two longitudinally extending sections of frame, each with cables extending through from one end to another. (Compare '117 Patent (DE 1-9) col. 8, ll. 14-24, with Finneran Decl. (DE 23) ¶ 23. And the respective frame sections in each are kept connected by the cable running through each.

In sum, examining the accused product, the Beach Shade, and the claimed limitations of the patents-in-suit on a limitation-by-limitation basis, plaintiff has made a clear showing there likely is equivalence between the elements of the accused product and the claimed limitations of the patents.

        c.     Prosecution History Estoppel

Defendants argue that plaintiff, through its actions in prosecuting the instant patents' applications and approvals, has "ceded such subject matter," as would "encompass[] shades with cords connecting to the exterior of the anchor container or that had multiple or non-continuous

frames," "in order to gain Patent Office approval." (Defs.' Resp. (DE 22) at 23).

"[P]rosecution history estoppel can prevent a patentee from relying on the doctrine of equivalents when the patentee relinquishes subject matter during the prosecution of the patent, either by amendment or argument." Eagle Comtronics, Inc. v. Arrow Commc'n Lab'ys, Inc., 305 F.3d 1303, 1315 (Fed. Cir. 2002); see also Eli Lilly & Co. v. Hospira, Inc., 933 F.3d 1320, 1330 (Fed. Cir. 2019) ("Prosecution history estoppel arises when a patent applicant narrows the scope of his claims during prosecution for a reason substantially relating to patentability."). "Such a narrowing amendment is presumed to be a surrender of all equivalents within the territory between the original claim and the amended claim . . . ." Eli Lilly, 933 F.3d at 1330; Duramed Pharms., Inc. v. Paddock Lab'ys, Inc., 644 F.3d 1376, 1380 (Fed. Cir. 2011) (explaining that because the patentee "narrowed the scope of the . . . patent's claims in response to a prior art rejection, a presumption of prosecution history estoppel applies").

Yet, a patentee can rebut this presumption by showing, among other exceptions, "that the rationale of its amendment '[bore] no more than a tangential relation to the equivalent in question.'" Eli Lilly, 933 F.3d at 1330 (quoting Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 740 (2002)). However, "an amendment made to avoid prior art that contains the equivalent in question is not tangential; it is central to allowance of the claim." Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 344 F.3d 1359, 1369 (Fed. Cir. 2003) (en banc). To make this determination, the court must "look to the specifics of the amendment and the rejection that provoked the amendment to determine whether estoppel precludes the particular doctrine of equivalents argument being made." Intervet Inc. v. Merial Ltd., 617 F.3d 1282, 1291 (Fed. Cir. 2010).

Here, each disputed portion of the patents' claims ("single, continuous frame," "interior of the container," and "a cable extending through") was added through amendment in response to the patent examiner's rejection of the original version of the respective claim, implicating prosecution history estoppel. However, in each case, the amendment bore no more than a tangential relation to the equivalent in question.

i.    A Single, Continuous Frame

First, the claim language "single, continuous[] . . . frame"[7] was added to the nascent '330 Patent to address the patent examiner's rejection of the then-putative claim 1 as being anticipated by U.S. Patent No. 7,789,097, referred to by the parties and the patent examiner as "Sotirkys." (See '330 Patent File History (DE 24-6) at 49, 52, 79; see also Sotirkys Patent (DE 24-4) at [76]). The patent examiner explained that Sotirkys, as pertinent here, taught the system claimed, by reference to Sotirkys's "protective cover" on "two opposite sides" as anticipating the claimed canopy, (see '330 Patent File History (DE 24-6) at 79; Sotirkys Patent (DE 24-4) at 2, col. 2, ll. 35-36), and its "front pole," of five collapsible poles, "arched . . . and providing arcuate shape" that served to anticipate the claimed frame, (see '330 Patent File History (DE 24-6) at 79; Sotirkys Patent (DE 24-4) at 2, col. 2, l. 25, col. 3, ll. 22-23, col. 3, ll. 66-67).

In interview, the patent examiner explained that Sotirkys would be overcome by amendment to claim 1 adding "singular, continuously linear" before "frame" and accompanying remarks that clarified that "[t]he single frame is the only frame or pole attached to or used to support the canopy." (See '330 Patent File History (DE 24-6) at 59, 61). In plaintiff's subsequent

---

[7]      The language in the initial amendment was "single, continuously linear frame," ('330 Patent File History (DE 24-6) at 49, 53), but was later changed to address an unrelated reason for rejection by the patent examiner, (see id. at 40), to "single, continuous frame." (id. at 30, 33). Therefore, the analysis focuses on why the initial limitation relating to a single frame or one continuous in some manner was added by plaintiff.

amendment,[8] it explained that it "asserts that Sotirkys requires several supports," referencing the multiplanar frame portions of <u>Sotirkys</u>, "in addition to the arched front frame," (<u>id.</u> at 53), which resulted in <u>Sotirkys</u> no longer being referenced as teaching the claimed invention in the patent examiner's subsequent rejection on unrelated grounds, (<u>see id.</u> at 40-44).

<u>Sotirkys</u>, by its own description, relates to a "portable sunshade used in conjunction with and supported by a vehicle." (Sotirkys Patent (DE 24-4) col. 1, ll. 6-9). And the "front pole," itself, relies upon to separate "stakes" or "footings" to actually connect with the ground. (<u>Id.</u> at 2, col. 5, ll. 38-43, col. 5, ll. 62-63, col. 6, ll. 12-24). It is pictured below:



(<u>Id.</u> at 4).

Here, plaintiff narrowed the scope of claim 1 during prosecution for a reason substantially relating to patentability — that is, avoiding <u>Sotirkys</u> — presumptively surrendering all equivalents

---

8      For the purposes of this order, the court treats the '330 and '117 patentee, the applicant for '330 and '117 Patents, and plaintiff all as synonymous.

between the original claim and the amended claim.  However, the rationale for this amendment, shown in the prosecution history, has only a tangential relation to the equivalent of a two-pole composition in a continuous arched front frame.  See Festo Corp, 344 F.3d at 1369 (explaining that a relation is tangential where it is "peripheral, or not directly relevant").  The objectively apparent reason for the Sotirkys-inspired amendment was to distinguish the invention over a prior art system that "require[d] several supports . . . in addition to [an] arched front frame," such that "the single frame" was not "the only frame or pole attached to or used to support the canopy." ('330 Patent File History (DE 24-6) at 53, 59).   As is apparent from "reference to the context in which [the amendment] was made, including the prior art that might have given rise to the amendment in the first place," see Eli Lilly, 933 F.3d at 1332, the amendment was not to avoid the prior art's single arched front frame, regardless of number of sections, but to avoid the prior art's use of supports beyond that single front arch.

To the extent that defendants also argue that plaintiff ceded the two-interconnecting-pole frame equivalent by amendment in response to the examiner's invocation of "Heining," U.S. Patent No. 9,051,755, (see Defs.' Resp. (DE 22) at 7, 15), this argument too fails.

After the amendment in response to Sotirkys, the examiner rejected the proposed claim language "a canopy configured for engagement with, and complete aerial suspension by, a single continuously linear frame," ('330 Patent File History (DE 24-6) at 49), as anticipated by Heining, (id. at 42), which claims "[a] system for creating decorative arches and columns of balloons, comprising "a baseplate to provide a foundation, a mounting pin upon which a starter pole can be mounted, and a plurality of extension poles to attach to the starter pole to create a column or arch." U.S. Patent. No. 9,051,755, at [57] (filed June 9, 2015) (hereinafter "Heining" or "Heining Patent").  In response, plaintiff amended the language to its current form of "continuous frame"

and added the portions of claim 1 regarding the container acting as an anchor for housing weight. ('330 Patent File History (DE 24-6) at 30, 36). However, the change from continuously linear frame to continuous frame and the inclusion of the container as an anchor holds a tangential, if any, relation to Beach Shade's two-pole arch frame equivalent.

ii.     Interior of the Container

As just noted, the language including the phrase "a cord selectively engaged or coupled to an interior of the container" was added to claim 1 of the '330 Patent in response to the examiner's Heining-based rejection. Examination of the record of the prosecution history and Heining, the relevant prior art, reveals that this amendment bears only a peripheral relation to the Beach Shade's element of a cord engaging with the exterior of the container. The added language regarding anchoring by connection to the carrying container avoided Heining's "base plate" anchoring system for its "plurality of extension poles" capable of forming an arch in some embodiments. Compare ('330 Patent History (DE 24-6) at 33, 42), with Heining Patent, col. 1, l. 67–col. 2, l. 4, col. 8, ll. 59-65, col. 9, ll. 15-23).

Because plaintiff added this limitation to distinguish the '330 Patent from a prior art device consisting of base plate anchors, the amendment does not pertain to the disputed element in the accused device, a cord connecting to the exterior of a container, and is therefore merely tangential to that equivalent. See, e.g., Primos, Inc. v. Hunter's Specialties, Inc., 451 F.3d 841, 849 (Fed. Cir. 2006) ("The patentee added the 'differentially spaced' limitation to distinguish the diaphragm mouth call from a prior art device that consisted of a shelf-like structure positioned on top of the membrane without any spacing. The accused device, however, includes a dome that is spaced above the membrane."). Therefore, prosecution history estoppel does not bar plaintiff's reliance on the Beach Shade's cord connection point on the exterior of the carrying case as an equivalent

of the '330 Patent's cord connection point on the invertible, interior of the carrying container for its theory of infringement.

### iii.     A Cable Extending Through

Finally, the language in claim 1 of the '117 patent that added the phrase "a cable extending through the plurality of longitudinally-extending sections of the frame" was added in response to the examiner's rejection of the claim as previously written as being anticipated by a "butterfly arch" invention depicted in a YouTube video, described by the parties and the examiner as "Butterfly." ('117 Patent History (DE 24-6) at 147-48).  Plaintiff then amended the language of claim 1 to add

> a cable extending through the plurality of longitudinally-extending sections of the frame from the first end of the first longitudinally-extending section to the first end of the second longitudinally-extending section and any of the at least one intermediate longitudinally-extending sections arranged therebetween so that when the first end of the first longitudinally-extending section and the first end of the second-longitudinally extending section are engaged with the surface, the cable lies within the plane substantially perpendicular to the surface.

(id. at 141), which was not anticipated by Butterfly, as acknowledged by the examiner's statement that "Butterfly is silent on the use of a cable extending through the sections of the frame." (Id. at 136).  However, the examiner, again, rejected claim 1, even with this amended language, as being unpatentable over Butterfly, in view of U.S. Patent No. 2003/0089390, referred to as "Seo," which made it obvious to one of ordinary skill in the art to modify the Butterfly device to add a cable extending through the frame sections.  (Id. at 120-22).   The "cable extending through" language was repositioned within claim 1 and joined by additional dependent claims regarding an anchor and the trailing end of the canopy being suspended solely by wind, with plaintiff also asserting that Butterfly could not have cables added inside of its frame-poles because they were telescoping poles designed in order to nest within one another. (See id. at 60-62).  Upon this final amendment,

the examiner allowed the application, explaining, inter alia, that Butterfly "fails to teach the cable in the frame." (Id. at 14).

The amendment to add "a cable extending through" the frame sections is only tangentially related to the accused product's use of two cables running through the frame. The prior art avoided did not contain multiple cables and was not avoided for that reason, as evidenced by the patent prosecution file. Therefore, plaintiff is not estopped from relying on the doctrine of equivalents to argue that the Beach Shade's two-cable system is an infringing equivalent to the '117's claim of one cable running through the plurality of sections of the frame.

Applying the claims of the patents-in-suit, as construed herein, to the accused product, plaintiff has demonstrated a likelihood of success on the merits of its patent infringement claims, that is, that "success in establishing infringement is more likely than not." Trebro Mfg., Inc. v. Firefly Equip., LLC, 748 F.3d 1159, 1166 (Fed. Cir. 2014).

2.      Irreparable Harm

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." Winter, 555 U.S. at 22. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Id.

Specifically, "in a patent infringement suit," "to satisfy the irreparable harm factor, . . . a patentee must establish" also "that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." Apple, Inc. v. Samsung Elecs. Co., 695 F.3d 1370, 1374 (Fed. Cir. 2012) ("Apple II"). Ergo, where "the accused product would sell almost as well without incorporating the patented feature," there is not a likelihood of irreparable harm from the alleged

28

infringement.  Id. at 1374-75.  "The relevant question is . . . to what extent the harm resulting from selling the accused product can be ascribed to the infringement."  Id. at 1375.

Harm that can be easily remedied by money damages, axiomatically, does not constitute irreparable harm.  Celsis In Vitro, Inc. v. CellzDirect, Inc., 664 F.3d 922, 930 (Fed. Cir. 2012); see also Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994) ("[I]rreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate."), abrogated on other grounds by Winter, 555 U.S. 7.  However, "[w]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied."  Multi-Channel, 22 F.3d at 552; Celsis In Vitro, 664 F.3d at 930 ([L]oss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm.").

Further, where the accused product is in direct competition with plaintiff's product there may also be irreparable harm.  Douglas Dynamics, LLC v. Buyers Prod. Co., 717 F.3d 1336, 1345 (Fed. Cir. 2013) ("Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions."); Presidio Components, Inc. v. Am. Tech. Ceramics Corp., 702 F.3d 1351, 1354 (Fed. Cir. 2012) (holding that the patentee demonstrated irreparable harm where it was forced to compete for the same customers in the same markets as its infringer).

Here, plaintiff demonstrates, to the requisite degree, irreparable harm.  The court notes, first, that this is not a case, as in Apple II, "where the accused product includes many features of which only one (or a small minority) infringe" as would make the causal nexus inquiry especially pertinent.  See 695 F.3d at 1374; see also Genband US LLC v. Metaswitch Networks Corp., 861 F.3d 1378, 1384 n.2 (Fed. Cir. 2017) ("The causal-nexus inquiry may have little work to do in an

injunction analysis when the infringing product contains no feature relevant to consumers' purchasing decisions other than what the patent claims. In such a case, causal nexus and consumer demand may be apparent from the simple fact of infringing sales."). This is not a case where "the patentee" relies on "some insubstantial connection between the alleged harm and the infringement" in order to "check the causal nexus requirement off the list." Apple II, 695 F.3d at 1375. Instead, plaintiff, regarding the types of harm discussed below, has made "'a clear showing' that it is at risk of irreparable harm" through demonstration of "'a likelihood of substantial and immediate irreparable injury.'" Apple, Inc. v. Samsung Elecs. Co., 678 F.3d 1314, 1324 (Fed. Cir. 2012) ("Apple I") (first quoting Winter, 555 U.S. at 22; and then quoting O'Shea v. Littleton, 414 U.S. 488, 502 (1974)).

Plaintiff convincingly demonstrates, as further supported by Barnes's testimony at hearing, that it relies on a seasonal business model, due to the demand for beach shades in the warmer months, and that failing to garner customers during the relevant season results in the loss of repeat, future customers, meaning that the loss of business opportunities is threatened as is the permanent loss of customers to a competitor. (Barnes First Decl. (DE 5) ¶ 12; see also Customer Reviews (DE 5-7) at 3; Customer Reviews (DE 5-8) at 6-7). Further, plaintiff has presented evidence of harm to its reputation and good will with customers as consumers, unaware of the cause of the price difference between the two products, are frustrated with plaintiff and/or are confused as to the difference in the quality of the products. (See, e.g., Customer Comments & Reviews (DE 5-8) at 5-6, Customer Correspondence (DE 5-9) at 2; Customer Correspondence (DE 5-10) at 2; Customer Comments (DE 5-14) at 2; Customer Review (DE 15-2) at 2; Customer Comment (DE 15-6) at 2; see also Barnes First Decl. (DE 5) ¶¶ 24-25). See generally Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1558 (Fed. Cir. 1994) ("Harm to reputation resulting from confusion

between an inferior accused product and a patentee's superior product is a type of harm that is often not fully compensable by money because the damages caused are speculative and difficult to measure.").[9]

Finally, absent a preliminary injunction, plaintiff, because it is "in competition" with defendant Beach Shade, will "suffer[] the harm . . . of being forced to compete against [a] product[] that incorporate[s] and infringe[s] its own patented invention[]." Douglas Dynamics, 717 F.3d at 1345. During the time defendant Beach Shade was selling its product, prior to the consent order, it "was making sales in direct competition with [plaintiff], causing [plaintiff] to lose sales and thereby to suffer harms of the type often found irreparable." Genband, 861 F.3d at 1381; (see, e.g., Customer Comments (DE 5-8) at 6; Customer Correspondence (DE 5-9) at 2; Customer Correspondence (DE 5-10) at 2; Customer Comments (DE 5-14) at 2; Customer Review (DE 15-2) at 2; Customer Review (DE 15-7) at 2; Customer Review (DE 15-8) at 2; see also Barnes First Decl. (DE 5) ¶ 15). Based on the foregoing evidence of customer correspondence, comments, and reviews, irreparable injury is likely in absence of the sought injunctive relief.

Defendants, citing this court's order in Edge-Works Manufacturing Co. v. HSG, LLC, 285 F. Supp. 3d 883 (E.D.N.C. 2018), argue that plaintiff has not offered "competent evidence" of irreparable harm. (Defs.' Resp. (DE 22) at 30). However, unlike Edge-Works, plaintiff has not relied upon "unsupported assertions" alone, see 285 F. Supp. 3d at 901, and, rather, has proffered direct evidence of customers' perceptions and decision-making calculus as demonstrated by their comments and reviews. Further, here, there is "evidence . . . to establish that direction competition

---

[9]    The court in no way relies on Reebok's presumption of irreparable harm, 32 F.3d at 1556 ("A strong showing of likelihood of success on the merits coupled with continuing infringement raises a presumption of irreparable harm to the patentee."), as the Federal Circuit has later explained that subsequent Supreme Court jurisprudence "jettisoned the presumption of irreparable harm as it applies to determining the appropriateness of injunctive relief" for patent infringement matters. See, e.g., Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1149 (Fed. Cir. 2011).

in the same market is occurring," such that the court does have a "factual record on which to rule that irreparable harm to plaintiff's place in the market is likely." Id. The instant case thus is distinct from that considered by the court in Edge-Works.

In sum, plaintiff has demonstrated likely irreparable injury absent an injunction.

3.      Balance of Equities

"The district court must weigh the harm to the moving party if the injunction is not granted against the harm to the non-moving party if the injunction is granted." Metalcraft of Mayville, Inc. v. The Toro Co., 848 F.3d 1358, 1369 (Fed. Cir. 2017).

Here, the balance of equities tilts towards the grant of an injunction given that the harm to plaintiff if one is not granted outweighs the potential harm to defendants if one is granted. While an injunction will cause defendants hardship, it is not distinct from the harm any alleged infringer would suffer if enjoined. The fact that an accused infringer would be put out of business "does not insulate it from the issuance of a preliminary injunction" if other factors weigh in favor of the relief, Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys., 132 F.3d 701, 708 (Fed. Cir. 1997), which they do here, given that, inter alia, defendants indicate they have purchased only 1000 units from their manufacturer, 900 of which have already been sold, and have only recently joined the market. (See Barnes First Decl. (DE 5) ¶ 15; Finneran Decl. (DE 23) ¶ 7; Aug. 6, 2021, Hr'g).

In addition, "[i]t is axiomatic that an infringer . . . cannot complain about the loss of ability to offer its infringing product." LEGO A/S v. ZURU Inc., 799 F. App'x 823, 832 (Fed. Cir. 2020); see, e.g., Trebro Mfg, 748 F.3d at 1171 (noting as relevant to the equities inquiry that "[plaintiff] is losing business to a new entrant selling a likely-infringing product"). Further, as discussed below, the requirement of a Rule 65(c) bond will ameliorate any potential harm caused by the injunction. See, e.g., Scotts Co. v. United Indus. Corp., 315 F.3d 264, 285 (4th Cir. 2002) ("While

the defendants would incur the monetary costs of complying with the injunction . . . they would be protected by the substantial bond posted by [plaintiffs].").

Defendants contend that an injunction prohibiting it from selling the accused product would not represent a return to the status quo, (Defs.' Resp. (DE 22) at 5), as is relevant to "the ultimate balance of equities." Revision Mil., Inc. v. Balboa Mfg. Co., 700 F.3d 524, 526 (Fed. Cir. 2012); accord Donaldson v. U.S. Dep't of Lab., 930 F.2d 339, 346 (4th Cir. 1991).

"The rationale behind a grant of a preliminary injunction has been explained as preserving the status quo so that a court can render a meaningful decision after a trial on the merits." Hazardous Waste Treatment Council v. South Carolina, 945 F.2d 781, 788 (4th Cir. 1991). Accordingly, "[m]andatory preliminary injunctive relief," that is, action-inducing relief, "in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." Taylor v. Freeman, 34 F.3d 266, 270 n.2 (4th Cir. 1994); see E. Tenn. Nat. Gas Co. v. Sage, 361 F.3d 808, 828 (4th Cir. 2004); Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980). However, the Fourth Circuit has recognized that "[t]o be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but . . . such an injunction restores, rather than disturbs, the status quo ante." League of Women Voters, 769 F.3d at 236.

Here, plaintiff acted quickly in attempt to return to status quo ante once defendants changed the state of affairs by offering a likely infringing product not previously on the market. Balance of the equities favors grant of plaintiff's sought-after injunctive relief because, among other reasons highlighted above, it would restore the status quo.

4.    Public's Interest

As to the final Winter factor, a preliminary injunction is in the public's interest. There is an important public interest in favor of protecting the rights secured by a valid patent. See Hybritech, Inc. v. Abbott Labs., 849 F.2d 1446, 1458 (Fed. Cir. 1988). And the "public is best

served by enforcing patents that are likely valid and infringed." Abbott Labs. v. Andrx Pharms., Inc., 452 F.3d 1331, 1348 (Fed. Cir. 2006). Further, the fact that the instant "patent[s] deal[] with [a niche industry]" indicates that an injunction "may not have a broad-reaching effect" that would impact the public's interest negatively. See Trebro Mfg., 748 F.3d at 1172. Finally, there does not appear to be "some critical public interest that would be injured by the grant of preliminary relief." Hybritech, 849 F.2d at 1458.

     5.    Scope of Injunction

     Rule 65 requires that "[e]very order granting an injunction . . . state its terms specifically; and describe in reasonable detail . . . the acts or acts retrained." Fed. R. Civ. P. 65(d)(1). "Injunctions must be narrowly tailored and should prohibit only unlawful conduct." CPC Int'l, Inc. v. Skippy Inc., 214 F.3d 456, 461 (4th Cir. 2000). An injunctive "order must be tailored as precisely as possible to the exact needs of the case." Id.; see, e.g., Nat'l Audubon Soc'y v. Dep't of Navy, 422 F.3d 174, 181 (4th Cir. 2005) (stating "the injunction issued by the district court was overly broad" and remanding "with instructions to narrow the injunction"). "Absent this narrowing, . . . [an] injunction[] will not survive appellate review." Cromer v. Kraft Foods N. Am., Inc., 390 F.3d 812, 818 (4th Cir. 2004). In addition, "basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." Pashby v. Delia, 709 F.3d 307, 331 (4th Cir. 2013).

     Here, when limited to the portions related to the meritorious patent infringement claims, the preliminary injunction sought by plaintiff is neither overly broad nor insufficiently precise. Plaintiff seeks to enjoin infringement of the patents-in-suit by, specifically, enjoining the manufacture, import, use, sale, and offers to sell the accused product through various retail avenues. This is narrowly tailored to the conduct that is likely unlawful, that is, infringing, as discussed above. Moreover, the Federal Circuit has affirmed analogously phrased injunctions.

34

See Metalcraft, 848 F.3d at 1369 (affirming as sufficiently definite "district court's order enjoin[ing] [defendant] from 'making, using, selling, and offering to sell lawnmowers equipped with platform suspension systems that infringe [plaintiff's] patent'").

6.      Bond

"The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  A "district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." Pashby, 709 F.3d at 332.

"In fixing the amount of an injunction bond, the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." Hoechst Diafoil Co. v. Nan Ya Plastics, Inc., 174 F.3d 411, 421 n.3 (4th Cir. 1999).  "The burden of establishing the bond amount rests with the party to be restrained, who is in the best position to determine the harm it will suffer from a wrongful restraint." Lab'y Corp. of Am. Holdings v. Kearns, 84 F. Supp. 3d 447, 465 (M.D.N.C. 2015); accord Equifax Servs., Inc. v. Hitz, 905 F.2d 1355, 1362 (10th Cir. 1990).

Here, defendants urge that they will suffer grave harm if the injunction is found to be improvident.  (Defs.' Resp. (DE 22) at 33).  Plaintiff indicates a willingness to post a bond as required, although it requests a nominal one.  (Pl.'s Mem. (DE 4) at 23).  Defendants assert that the accused product is the sole product sold by defendant Beach Shade and that the inability to sell during the pendency of this matter will cripple the business's operations.  (Finneran Decl. (DE 23) ¶ 9).  Requiring plaintiff to post a bond will help mitigate this harm.  However, defendants fail to

quantify, with supporting evidence, their possible harm beyond "substantial," (Defs.' Resp. (DE 22) at 34), precluding detailed calculations bearing on a bond amount.

Defendants, without further support, aver that defendant Beach Shade was "projected to have sales in 2021, which would have generated revenues in excess of one million dollars." (Finneran Decl. (DE 23) ¶ 23). At the time of the August 6, 2021, hearing, defendant Beach Shade had sold 900 units of the accused product, over the course of five to six weeks, at a price point varying between $150.00 and $174.99, which defense counsel represented had resulted in approximately $150,000.00 in sales and tens of thousands of dollars in profit. (See Barnes First Decl. (DE 5) ¶¶ 11-13; Beach Shade Website (DE 5-2) at 2; Amazon Product Listing (DE 5-8) at 2; Finneran Decl. (DE 22) ¶ 7; Aug. 6, 2021, Hr'g). On the parties' description of the beach shade industry and market, the concrete figure of $150,000.00 in sales over a six-week period in the summer represents a peak sales volume for the Beach Shade. This is joined by the nebulous estimate of tens of thousands of dollars in profit from the $150,000.00 in sales, from which the court tentatively derives a rough 10% profit margin.

Assuming a remaining pre-trial period of approximately one year, based upon a standard case track, and accounting for the uncertainties of future sales, defendants stand to lose a conservatively estimated $600,000.00 in sales during this time period. Thus, applying a 10% profit margin, the court finds that a bond of $60,000.00, accounting for both costs avoided and potential profits lost, represents "the gravity of the potential harm to the enjoined party." Hoechst Diafoil, 174 F.3d at 421. Accordingly, plaintiff shall post security of $60,000.00, pursuant to Federal Rule of Civil Procedure 65(c).

**CONCLUSION**

Based on the foregoing, plaintiff's motion for injunctive relief (DE 3) IS GRANTED IN PART as set forth herein. Within 14 days of the entry of this order, plaintiff shall post security of $60,000.00 with the Clerk of Court, and shall file notice thereof. Upon posting of the bond described herein, defendants and those in active participation with them are enjoined, pending further order of the court, from:

1)      continuing infringement of the claims of the '330 and '117 Patents; and

2)      continuing manufacture, importation, use, sale, and offers to sell the "Beach Shade" product, whether in person, in brick-and-mortar retail stores, or through defendant Beach Shade's website, social media, or third-party online retailers.

Because plaintiff's motion has been resolved, the June 29, 2021, consent order (DE 18) is VACATED. Defendants' motion to strike (DE 35) is DENIED AS MOOT.

The court's initial order on planning and scheduling will follow.

SO ORDERED, this the 8th day of February, 2022.

_____
LOUISE W. FLANAGAN
United States District Judge